**UNITED STATES**

v.

**Michael H. ALLEN, 278 36 4886, Radioman Senior Chief (E–8), U.S. Navy (Ret.).**

**NMCM 88 1330R.**

U.S. Navy–Marine Corps Court of Military Review.

Sentence Adjudged 14 Aug. 1987.

Decided 15 June 1990.[*]

---

[*] Release and distribution of this decision was delayed until completion of classification review on 19 June 1990.

R. Clayton Seaman, Jr., Civilian Defense Counsel.

Maj J.B. Gilbert, USMC, Appellate Defense Counsel.

Maj Thomas D. Miller, USMC, Appellate Government Counsel.

LT John J. Mulrooney, II, JAGC, USNR, Appellate Government Counsel.

ALBERTSON, Senior Judge:

Contrary to his pleas, the appellant was found guilty at a general court-martial composed of officer members of seven specifications under Charge I alleging disobedience of security regulations in violation of Article 92, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 892, two specifications under Charge II alleging espionage activity on behalf of the Philippine Government in violation of Article 106a, UCMJ, 10 U.S.C. § 906a, and one specification under Charge III alleging violation of the Federal espionage statute, 18 U.S.C. § 793(d) in violation of Article 134, UCMJ, 10 U.S.C. § 934. Appellant was sentenced to confinement for eight years and to pay a fine of $10,000.00. The convening authority approved the findings and sentence adjudged.

On review the appellant specified twelve assignments of error:

I. UNLAWFUL COMMAND INFLUENCE UNFAIRLY PREJUDICED THE ACCUSED'S TRIAL AND DEPRIVED THE ACCUSED OF A FAIR TRIAL IN DEROGATION OF HIS RIGHT TO DUE PROCESS UNDER THE FIFTH AMENDMENT TO THE CONSTITUTION.

II. THE MILITARY JUDGE ERRED IN REFUSING TO RECUSE HIMSELF ON THE GROUNDS THAT HE WAS A PERCIPIENT WITNESS TO COMMAND INFLUENCE AND THAT HE WOULD BE CALLED UPON TO JUDGE THE CREDIBILITY OF OTHER WITNESSES BASED UPON HIS OWN SPECIAL KNOWLEDGE.

III. THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE ACCUSED IN REFUSING TO COMPEL THE ATTENDANCE OF SEVERAL CRITICAL DEFENSE WITNESSES.

IV. THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE ACCUSED BY REFUSING TO GRANT A CONTINUANCE SO THAT THE DEFENSE COULD OBTAIN THE ASSISTANCE OF AN EXPERT WITNESS.

V. THE TRIAL JUDGE ERRED IN FAILING TO SUPPRESS ALL OBJECTS SEIZED AS A RESULT OF A FAULTY SEARCH AUTHORIZATION ISSUED BY REAR ADMIRAL LEWIN.

VI. THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE ACCUSED BY ADMITTING PROSECUTION EXHIBIT 50 INTO EVIDENCE OVER OBJECTION.

VII. FAILURE TO PROPERLY PAY RMCS ALLEN WHILE HE WAS IN PRETRIAL CONFINEMENT CONSTITUTES A VIOLATION OF ARTICLE 13 OF THE UCMJ AS WELL AS THE THIRTEENTH AMENDMENT TO THE CONSTITUTION.

VIII. THE GOVERNMENT ACTED IN EXCESS OF ITS JURISDICTION BY DEPRIVING THE ACCUSED OF PAY PRIOR TO THE CONVENING AUTHORITY TAKING HIS ACTION IN THE CASE.

IX. THE TRIAL JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE ACCUSED BY FAILING TO DISMISS CHARGE I AND THE SPECIFICATIONS THEREUNDER.

X. A RETIRED SERVICEMEMBER IS NOT SUBJECT TO THE ORDERS OF AN ACTIVE DUTY OFFICER UNTIL AFTER THE RETIREE HAS BEEN RECALLED TO ACTIVE DUTY.

XI. THE FAILURE TO PROVIDE THE ACCUSED WITH A TWELVE MEMBER COURT–MARTIAL PANEL IS VIOLATIVE OF THE FIFTH AMENDMENT TO THE CONSTITUTION.

XII. THE CONVENING AUTHORITY'S ACTION IS IMPROPER ON ITS FACE AND INDICATES THAT THE ACCUSED'S CASE DID NOT RECEIVE THE CONSIDERATION REQUIRED BY ARTICLE 60, UCMJ.

We will discuss assignments I–XI. Assignment of error XII was resolved by this Court in *United States v. Allen*, 28 M.J. 610 (NMCMR 1989).

## BACKGROUND

Appellant is a retired Senior Chief (E–8) Radioman who served 22 years in the United States Navy. During his career, appellant worked with classified matter and in sensitive positions, such as intelligence gathering in Vietnam and as Communications Watch Officer and Staff Message Center Officer for Commander, Naval Air Forces, Pacific, at Naval Air Station, North Island. He retired in 1972 and some time thereafter moved to the Republic of the Philippines where he was hired as a civilian reproduction clerk at the Naval Telecommunications Command Center, Naval Base, Subic Bay, Republic of the Philippines (NTCC). Appellant's duties at NTCC involved the routing of messages, both routine and classified. He was also required to copy incoming messages and route them to the proper boxes within the message center for distribution to the appropriate commands on base.

Appellant's co-workers at NTCC began to notice that appellant was reading, researching, photocopying, and taking messages from the NTCC. An investigation into his activities was begun by Naval Investigative Service (NIS). That investigation, including the video-monitoring of appellant's activities within the NTCC, revealed that appellant was reading, copying, and taking notes of messages determined by the NIS agent-monitors of the surveillance video cameras to be documents containing information classified either CONFIDENTIAL or SECRET. Appellant was also observed folding copies of some of these messages and putting them either in his trousers' pocket or in his socks and leaving the message center.

During the course of these events, appellant was an "undercover source" for the NIS. Prior to the events in question, appellant was a "confidential informant" tasked with collecting both criminal and "foreign counter-intelligence information" for the United States. During the conduct of the investigation into his suspicious conduct (June to early December 1986), however, appellant was solely tasked with collecting criminal information. The NIS agent who acted as appellant's handler during the investigation of appellant testified that he had been told only to task appellant with collecting criminal information but that he had never informed appellant that his counter-intelligence tasking had been cancelled. In fact, the NIS agent stated that he had been told to accept any counter-intelligence information the appellant gave him. In addition to the video-taping of appellant at his place of work, the investigation included undercover surveillance of the appellant's civilian residence in Olongapo City, wiretaps of appellant's telephone, screening of return addresses on all appellant's mail, bogus messages sent through the message center to attract appellant's attention and action, and an undercover ruse in which the appellant's NIS handler portrayed himself as a disaffected

NIS agent in an attempt to befriend the appellant and encourage him to disclose evidence of espionage. None of these surveillance techniques revealed that appellant directly disclosed classified information to the Philippine Government.

The appellant was apprehended on December 4, 1986, and held incommunicado while he was interrogated. At the time of his apprehension, a classified (SECRET) message, a mission order, a false NIS identification badge, and a 9mm Baretta semiautomatic pistol were seized from the appellant. Additionally, pursuant to a search authorization issued by Commander Naval Forces Philippines, classified or classifiable documents were retrieved from appellant's off-base residence. A document was also retrieved from a colonel of the Philippine Constabulary.

In sworn statements made to NIS appellant admitted that over a period of time he had copied and removed classified messages and information from NTCC and taken them to his residence where he maintained a file of information he had collected, also over a period of time, from various sources, including synopsized information he had gained from reading classified messages. He also admitted that he had given synopsized information to two members of the Philippine Constabulary. He could not recall the specific information he had provided or the specific dates.

After making a statement, the accused was flown by special military flight to the United States via Guam and Hawaii.

More specific facts will be discussed as they become relevant to our analysis of each assignment of error.

# I. COMMAND INFLUENCE

 It is well-settled that every servicemember tried by court-martial is entitled to have his guilt or innocence tried by a court solely upon the evidence presented at the trial, free from questionable motives and free from all unlawful influence exerted either by military superiors or others. *United States v. Jackson,* 3 M.J. 153 (C.M.

A.1977); *United States v. Isbell,* 3 U.S.C. M.A. 782, 14 C.M.R. 200 (1954). Charges must be referred and post-trial action taken by a convening authority who is independent. Consequently, unlawful command influence is prohibited, Article 37, UCMJ, 10 U.S.C. § 837, and punishable as an offense under the Code. Article 98, UCMJ, 10 U.S.C. § 898.

## A. *Secretarial Control*

Appellant's first assignment of error is considerably more complicated than the issue as framed would appear. A full development of the facts is necessary to put the issue in perspective. Appellant claims that unlawful command influence in the nature of improper secretarial control over the court-martial process became institutionalized in courts-martial involving national security cases. This institutionalized unlawful command influence was the result of the Secretary of the Navy's attitude toward national security cases as evidenced by his adamant public disapproval of the then recent Department of Justice handling of espionage cases and the sentences adjudged by Federal district courts, particularly in the Walker family espionage cases.

Appellant specifically contends that the Secretary unlawfully restricted the number of convening authorities and unlawfully interfered with the discretion of those convening authorities by directing how they should dispose of cases and by restricting their ability to enter into pretrial agreements and to take any clemency action they might believe appropriate. The fourth aspect of appellant's allegation of unlawful command influence concerns the Secretary's creation of a special judge program for cases involving national security.

Although asserted wholly in terms of unlawful command influence, appellant's assignment of error, at least as it pertains to an attack on the promulgation of secretarial directives, really addresses, in part, an issue akin to the accuser concept.[1]

Appellant's allegations relating to the impropriety of the Secretary's promulgation

---

1. JAGINST 5800.7B dated 1 July 1978.

of the JAGMAN changes and the Special Judge Program [2] apply more to the accuser concept while the questions pertaining to the propriety of the Secretary's instructions limiting the number of convening authorities who could dispose of national security cases and the exercise of discretion by those convening authorities in disposing of cases, acting on pretrial agreements, and granting clemency, involve unlawful command influence principles. Resolution of this assigned error, therefore, requires a discussion of the law of these two separate, yet overlapping, legal concepts.

■ The accuser concept differs from unlawful command influence in that it denotes someone who has such a personal interest in, or has predetermined the outcome of, the case that his judgment could reasonably be questioned. To preclude the personal interest of the accuser a procedure was created whereby "an accused could be brought to trial in an atmosphere free from coercion by one who could, directly or indirectly, influence the court.... This atmosphere requires that the officer who convenes the court and reviews the sentence shall himself be free from any influence from the accuser." *United States v. LaGrange*, 1 U.S.C.M.A. 342, 3 C.M.R. 76, 79 (1952). Except for the decision to refer, an officer who exercises court-martial convening authority is required to fill a neutral role in the court-martial process and he abandons that role if he himself is an accuser. *See United States v. Jackson*, 3 M.J. 153 (C.M.A.1977). Unlawful command influence, on the other hand, is impermissible command control. It describes a situation wherein a superior, at the very least, attempts to direct substitution of his judgment for that of a subordinate decision-maker who has the responsibility to make an independent discretion-

ary decision. *United States v. Isbell*, 3 U.S.C.M.A. 782, 14 C.M.R. 200 (1954). Not only are the concepts different but so are the consequences. If the accuser concept has been violated, it must be objected to or it is waived; unlawful command influence is never waived. The line between the two concepts, however, is often finely drawn, often crossed over or not always identified.

### 1. The Accuser Concept

■ The principle that an accused is entitled to have a convening authority who is unbiased and impartial is violated if the convening authority abrogates his responsibility in carrying out this neutral role had been a longstanding one. That a convening authority could be found to have abrogated his responsibility when his motives could reasonably be perceived as being prosecutorial in nature, and thus prohibiting him from acting in the case because he was an "accuser," had also been a longstanding principle. *United States v. Jackson*, 3 M.J. 153 (C.M.A.1977). The remedy for violation of the accuser concept was reversal due to jurisdictional error that rendered the proceedings a nullity regardless whether the accused had suffered any prejudice. *Id.;* Articles 1(9), 22(b) and 23(b), UCMJ, 10 U.S.C. §§ 801(9), 822(b), 823(b). In 1986, however, the Court of Military Appeals took a more narrow stance and held in *United States v. Ridley*, 22 M.J. 43 (C.M.A.1986), that even though a convening authority was disqualified because he was an accuser, as defined in Article 23(b), UCMJ, the disqualification did not amount to jurisdictional error. Furthermore, in *United States v. Fernandez*, 24 M.J. 77 (C.M.A.1987), the Court held that when a convening authority refers a case to court-martial he is functioning in a prosecutorial rather than a judicial role.[3] Thus, the ac-

---

**2.** The Court takes judicial notice of the instructions hereinafter cited. NAVMARTRIJUDICINST 5810.3 as authorized by JAGINST 5813.-4E as further authorized by section 0120 JAGMAN. NAVMARTRIJUDICINST 5810.3 requires that the circuit and branch offices "provide the Chief Judge with current information as to any notorious, highly publicized, or sensitive courts-martial within his or her circuit." Further, "national security cases may require

that the detailed military judge possess: special security clearances; lengthy trial experience; and special experience in handling classified information." NMCTJINST 5500.2 of 30 JAN 1987.

**3.** The Court did maintain the position that a convening authority functions as a judicial officer when he performs his post-trial duties of reviewing the sentence. Unstated, however,

cuser concept would seem *not* to apply to a convening authority's referral of a case to court-martial. Nevertheless, the Court indicated that the Article 23(b) disqualification was "intended to assure the impartiality and independence of the convening authority" and if the record contained "no intimation" that the convening authority had been influenced in any way adverse to the accused, reversal of the findings and sentence was not required despite the convening authority's disqualification under Article 23(b).[4] We interpret *Ridley* to mean that violation of the accuser concept is purely a statutory violation to be tested for prejudice under Article 59(a), UCMJ, 10 U.S.C. § 859(a). If the defense objects at the trial level and succeeds, dismissal of the charges would be required. But, since the Court has found that such a violation does not rise to the level of a jurisdictional defect, reversal will result at the appellate level only in those cases where the accused objected at trial *and* demonstrates that he has been prejudiced by the disqualification.

 We must determine, then, whether the accuser concept was violated in appellant's case and if it was, whether he was prejudiced such that reversible error was committed. Article 1(9), UCMJ, defines three types of accusers. Only two of the three have relevance to the resolution of this case: (1) any person who directs that charges nominally be signed and sworn by another; and (2) any other person who has an interest other than an official interest in the prosecution of the accused. The first type involves determining whether the convening authority has directed a subordinate to act as his *alter ego* in preferring charges. The second type involves determining whether the act in question was an act done because of an official or personal interest. The basic test for determining whether the convening authority is an accuser is whether he is "so closely connected to the offense that a reasonable person would conclude that he has a personal interest in the matter." *United States v.*

*Gordon,* 1 U.S.C.M.A. 255, 261, 2 C.M.R. 161, 167 (1952). Thus, when a convening authority directs an action or bases his decision on a personal rather than an official interest, he is statutorily disqualified from acting as a convening authority. *United States v. Reed,* 2 M.J. 64, 68 (C.M.A.1976); *Brookins v. Collins,* 23 U.S.C.M.A. 216, 49 C.M.R. 5 (1974); *see United States v. Thomas,* 22 M.J. 388, 394 (C.M.A. 1986).

Appellant's contention, in effect, is that the Secretary of the Navy had such an interest in cases involving national security, and in particular his case, that he had what amounted to a personal interest such that the JAGMAN changes and the Special Judge Program were promulgated illegally. Any action thereafter taken pursuant to those instructions as they relate to appellant's case was error amounting to an Article 1(9) disqualification of COMNAVAIRPAC as convening authority because COMNAVAIRPAC merely acted as the Secretary's *alter ego* rather than in accordance with his own discretion when he referred appellant's case for trial by general court-martial. The remedy for such disqualification is dismissal of the charges according to the appellant.

In support of his position, appellant offered at trial, the testimony of Captain Powell, staff judge advocate of the convening authority. Captain Powell testified that he, as well as most senior judge advocates, was aware of the Secretary's interest in the handling of national security cases and concern about the leniency of the courts in the Walker cases. Captain Powell also testified, however, that the convening authority did not feel any pressure had been placed upon him to make any specific decisions in appellant's case. Before us appellant submitted, on a motion we granted, copies of two newspaper articles (New York *Times,* dated October 30, 1985, "Navy Secretary, Criticizing Plea, Contradicts U.S. on Spying Case"; and New York *Times*

---

was what role he was functioning as when he performed duties pre-and post-referral which, prior to *Ridley,* were considered judicial functions.

4. The same principle would apply to a disqualification under Article 22(b), UCMJ.

dated 2 November 1985, "Lehman Rebuked by Weinberger over Complaint on Spy Case Deal") which reported the Secretary's displeasure with the handling of the Walker cases and the reprimand issued him by the Secretary of Defense because of Secretary Lehman's public recriminations of the Department of Justice. In further support of his assertions that such displeasure by Secretary Lehman was vented against him, appellant points to the fact that the Secretary promulgated changes to the JAGMAN by issuing ALNAV 013/86 (hereinafter ALNAV or JAGMAN) which implemented certain pretrial, trial, and post-trial procedures that placed the control of national security cases directly in his hands.[5] Appellant also points to the Secretary's creation of a Special Judge Program that reserved to the Chief Judge of the Navy–Marine Corps Trial Judiciary personal control over the detailing of military judges to courts-martial involving national security. Prior to the establishment of this program the circuit military judge detailed the presiding judge to courts-martial held within his circuit. The Chief Judge had never been responsible for the detailing of any military judges to courts-martial. He had merely made available or reassigned judges from other circuits when called upon for help by the circuit military judges. Appellant questions the coincidence of the completion of the Walker espionage trials and the concerns the Secretary had expressed about their results with the handling of the investigation into appellant's conduct, the promulgation of the JAGMAN changes and the Special Judge Program, the latter being promulgated just before critical decisions were to be made in his case. That the Secretary specifically knew about the appellant's case and was concerned about controlling its outcome is evidenced, says appellant, by a naval message dated 20 February 1987 addressed to Commander Naval Air Forces Pacific, the convening authority in appellant's case. That message stated in pertinent part:

> At the time SECNAV signed [the ALNAV of 22 January 1987] he understood that the case of [appellant] would be transferred for disposition to one of the commanders named in [the ALNAV], most probably COMNAVSURFPAC or COMNAVAIRPAC, and he specifically approved that action.

Appellate Exhibit X(c). Appellant also points to the fact that "[e]ven the military judge conceded that the Secretary may have been motivated by the civilian courts' lack of sensitivity to the problem." Appellant's response to the Government's reply brief at 6. Thus, infers appellant, the Secretary's personal displeasure with the outcome of the Walker espionage cases is directly reflected in the secretarial instructions and the implementation of the secretarial directives,[6] and they became the means by which the Secretary could prevent, what the Secretary, at least, perceived as unsatisfactory results from occurring within the Navy as a whole, and appellant's case in particular. As a result, appellant asserts that his case, including the pretrial procedures for referral, his negotiations for a pretrial agreement, the detailing of the military judge, and the clemency procedures were based upon regulations conceived out of a personal vice an official interest. As such those regulations were improperly promulgated and any effectuation of the procedures required by those regulations institutionalized the personal interest and impacted adversely, directly and improperly on the normal processing of his case.

Finally, appellant asserts that anyone acting under the auspices of those regulations was disqualified from acting in his case because the institutionalized personal interest created a *per se* disqualification. Additionally, the proximity to appellant's trial of the Secretary's sweeping regula-

---

5. We judicially note that the provisions of ALNAV 013/87 were incorporated in their entirety In Chapter I of the JAGMAN which in turn is approved by the Secretary of the Navy. We will hereinafter refer to these provisions by their current JAGMAN citation form.

6. The JAGMAN changes became effective 22 Jan 87; the Special Judge Program went into effect 30 Jan 87; the appellant was referred to trial by general court-martial on 2 February 1987.

tory changes, coupled with the Secretary's actual knowledge of and interest in appellant's case soon coming to trial, placed both overt and subtle pressures on the convening authority to refer his case to trial by general court-martial. The appellant was thereby prejudiced by the Secretary's interference in the discretionary decision-making of the convening authority.[7]

The creation of the Special Judge Program during the pretrial events of appellant's case is also challenged by appellant as reflecting the personal interest of the Secretary of the Navy. The appellant claims that the circuit military judge of the Southwest Judicial Circuit, Captain Donato, had decided to detail Captain Reed as the military judge for appellant's court-martial. Because of concerns expressed by the staff judge advocate to the Deputy Judge Advocate General that Captain Reed was a lenient sentencer, the Deputy Judge Advocate General called the Chief Judge of the Navy–Marine Corps Trial Judiciary about the matter. The Chief Judge recognized the impropriety of the call and ended the conversation. Subsequently, however, the Chief Judge telephoned the Deputy Judge Advocate General and advised him that a proposed regulation creating a Special Judge Program for national security cases had been awaiting secretarial action for over two years. The Chief Judge requested assistance of the Deputy Judge Advocate General in obtaining the Secretary's approval of that regulation. Answers to interrogatories posed by the defense to the Chief Judge do, however, reveal that the Navy–Marine Corps Trial Judiciary had designated for an undetermined period a specific military judge to preside at courts-martial involving national security matters. Apparently, an unofficial policy had been in

place from 1984–1986 that limited the trial judiciary to only one military judge cleared (authorized to have access to classified information after a background investigation) for these types of cases. The reason for that special limitation was the time and expense required to investigate and obtain the proper clearances at the Sensitive Compartmented Information (SCI) level.[8]

Implicit in the appellant's broad assertion, though, is that Captain Powell's call to the Deputy Judge Advocate General and the events that followed reflected the chain of command's recognition of the Secretary's concern in national security cases. That call, and the fact that the Special Judge Program was approved by the Acting Secretary three days prior to the referral of appellant's case to court-martial and eight days after issuance of the ALNAV, indicates that the chain of command was acting as the Secretary's *alter ego*.

We agree that if the Secretary did, in fact, have a personal vice an official interest in appellant's case, he would be an accuser and the legality of the directives he issued as a result thereof would be questionable. Article 1(9) and 22(b); *see United States v. Thomas*, 22 M.J. 388, 394 (C.M.A. 1986). Additionally, if the directives lack legal efficacy then any actions taken by a subordinate in the Secretary's chain of command who acted pursuant to those directives would be invalid because the subordinate would be disqualified from acting. *See United States v. Grow*, 3 U.S.C.M.A. 77, 11 C.M.R. 77 (1953); *United States v. Haygood*, 12 U.S.C.M.A. 481, 31 C.M.R. 67 (1961). But, absent evidence to the contrary, we presume that the Secretary carried out his official duties in accordance with his statutory authority and not pursuant to personal interests. *See United*

---

7. Presentation of additional support for his position was attempted by appellant by his moving for the production of four defense witnesses, Former Secretary of the Navy Lehman, Secretary of the Navy Webb—Secretary Lehman's successor, Captain Byrne—Chief Judge of the Navy–Marine Corps Trial Judiciary, and Lieutenant Colonel Powell—an attendee at a Marine Corps Staff Judge Advocate Conference at which a representative from the Office of the Judge Advocate General allegedly spoke about the Secretary's concerns about cases involving national

security matters. The failure of the military judge to grant the production of those witnesses and its impact on the outcome of this issue is addressed in the Production of Witness discussion below.

8. We note that appellant's case, as far as the record reflects, never involved information at the SCI level; the highest classification of information involved was SECRET.

*States v. Masusock*, 1 U.S.C.M.A. 32, 1 C.M.R. 32 (1951). We also agree that if the convening authority merely acted as the *alter ego* of the Secretary and made decisions in appellant's case solely pursuant to the direction of the Secretary, then the decisions he made in appellant's case were not his independent discretionary decisions but the Secretary's and thus invalid.

To evaluate the merit of appellant's assertions, however, we must first determine whether the regulations in question could be promulgated by the Secretary acting in an official capacity. Then we will determine whether the evidence of record indicates that the regulations, which appear proper on their face, were nonetheless improperly promulgated because of the Secretary's personal vice official interests.

■ First, the lawfulness of the Secretary's restriction of the number of convening authorities is governed by statute and presidential regulation. Article 22(a)(4), UCMJ, authorizes the Secretary of the Navy to convene general courts-martial. Article 36, UCMJ, 10 U.S.C. § 836, provides the President with the authority to prescribe pretrial procedures for cases to be tried by courts-martial. Rule for Courts–Martial (R.C.M.) 504 authorizes superior competent authority to limit the persons authorized by Article 22(a) to convene general courts-martial from so convening them;[9] it further permits the Secretary to designate commanders authorized to convene general courts-martial. R.C.M. 601(b) authorizes any convening authority to refer charges to a court-martial unless the power to do so has been withheld by superior competent authority. Additionally, R.C.M. 306(a) authorizes a superior commander to withhold the authority to dispose of offenses in a particular case, types of cases, or generally. But "[a] superior commander may not limit the discretion of the subordinate commander to act on cases over which authority has not been withheld." Rules for Court–Martial 401(d) and 407(b) specify how cases involving national security shall be handled by officers exercising special and general court-martial jurisdiction. R.C.M. 407(b) specifically provides for secretarial authority to prescribe regulations for the handling of national security cases. This R.C.M.'s predecessor is paragraph 33 f, Manual for Courts–Martial (MCM), United States, 1969 (Rev.), and Article 43(e), UCMJ. *Analysis*, R.C.M. 407, MCM, U.S., 1984. Section 0116f(3)(c) of the JAGMAN limits the authority to dispose of cases involving national security to nineteen specifically identified convening authorities. This limiting provision was implemented under the authority set forth in R.C.M.s 306(a) and 401(a), MCM, 1984. Cases involving national security are defined by JAGMAN § 0149(a)(2)(a). All of the offenses with which the appellant was charged fall within that definition.

Both Article 26, UCMJ, 10 U.S.C. § 826, and R.C.M. 503(b)(1) provide that a military judge shall be detailed to a court-martial in accordance with regulations prescribed by the Secretary. The rule also requires that the detailing person be a military judge directly responsible to the Judge Advocate General or his designee. When the Secretary of the Navy promulgated the Special Judge Program, he did so pursuant to statutory and regulatory authority. That secretarial regulation authorized the Chief Judge to detail military judges to cases involving national security.

9. The authority of superiors to restrict nonjudicial punishment and special and summary court-martial convening authority powers has been upheld by the Court of Military Appeals in *United States v. Hardy*, 4 M.J. 20, 22 (C.M.A. 1977), based upon Article 15(a), UCMJ, 10 U.S.C. § 815(a), and paragraph 5 b(4), MCM, 1969 (Rev.), (the predecessor of R.C.M. 504). The Court further stated that "unless they are so limited, their exercise pursuant to pertinent codal authority must be without interference. Article 37(a), UCMJ...." The analysis to R.C.M. 504 cites *Hardy*, among others, for the proposition that the authority to convene general courts-martial may similarly be restricted. We presume, therefore, that the President's authority to prescribe rules permitting superior competent authority to limit the exercise of court-martial jurisdiction is either inherent or falls within his Article 36 authority. Were it otherwise, the absence of any provision within Articles 22–24 similar to Article 15(a), which authorizes such limitation by superior competent authority, raises questions we need not address because of *Hardy*.

The Secretary thus had the statutory and regulatory authority to promulgate the directives in question; and the subject matter of his concern within those regulations was a proper and reasonable exercise of his discretion as the purpose was to establish a uniform system throughout the Navy and Marine Corps for identifying, evaluating, and handling cases involving national security. *See United States v. Harrison,* 19 U.S.C.M.A. 179, 41 C.M.R. 179 (1970). The Secretary's actions, therefore, were in accordance with existing regulations and, absence evidence to the contrary, were official actions.

■ The only evidence the appellant presents to support his allegation of personal interest on the part of the Secretary is the 20 February 1987 message, quoted above in pertinent part. Prior to Secretary Lehman's assumption of office, however, JAGMAN § 0116c(1)(a) required Secretarial authorization to refer to court-martial any retired member of the regular component of the Navy not on active duty but entitled to receive pay. In fact, JAGMAN § 0116c(3) also required secretarial authorization to apprehend and confine a retired member. These provisions presumably were promulgated to protect a retired member from being subjected to apprehension, confinement, and court-martial unless the conduct impacted adversely upon the naval service as determined at the highest level rather than by the vagaries of local commanders. Appellant was a retired member of the regular component of the Navy not on active duty but entitled to receive pay. The message cited by appellant merely shows that the command and the Secretary were complying with previously promulgated secretarial regulations.

We recognize that *animus* is not required before personal interest is found. But, when we apply the test for determining whether an individual is an accuser to the facts, we do not find that a reasonable probability exists that the Secretary's displeasure over the handling of the Walker espionage cases so closely connected him to appellant's case that he had a personal interest in its outcome. We find only that

he had an official interest in the Navy and Marine Corps uniformly identifying, evaluating, and handling cases involving national security.

We conclude that the appellant has failed to establish sufficient facts that would indicate that the Secretary of the Navy had a personal vice an official interest in the handling of national security cases in general, or in the appellant's case in particular. Absent any such finding of personal interest, we find the Secretary acted in accordance with his official responsibilities when he promulgated the JAGMAN changes and the Special Judge Program challenged by appellant. Article 1(9) was not offended.

Additionally, we find no evidence indicating that the convening authority acted solely at the behest of the Secretary such that the convening authority was merely the Secretary's *alter ego* and made no independent decisions in appellant's case, particularly with regard to its referral to a general court-martial. Indeed, the evidence presented by Captain Powell indicates that quite the contrary was true. Captain Powell unequivocally testified without objection that the convening authority acted in accordance with his own judgment, not the Secretary's.

Accordingly, we find no Article 1(9) impropriety rising to the level of disqualification of the convening authority as a result of his making decisions in appellant's case pursuant to the procedures required by the JAGMAN changes.

2. *Unlawful Command Influence*

Although we have resolved the accuser concept issue against the appellant because we found that the Secretary had only an official rather than a personal interest in the case and that the convening authority did not act merely as the *alter ego* of the Secretary, we are still left with the issue of whether the convening authority was subjected to unlawful command influence as a result of the provisions of the JAGMAN changes promulgated by the Secretary.

■ The Court of Military Appeals has recognized two types of unlawful command influence, actual and apparent. The test

for actual unlawful command influence is, figuratively speaking, "whether the convening authority has been brought into the deliberation room." *United States v. Grady*, 15 M.J. 275 (C.M.A.1983). It is based upon considerations from inside the military justice system. *United States v. Cruz*, 20 M.J. 873, 882 (ACMR 1985). In fact, "actual unlawful command influence can arise from an inaccurate perception of the commander's desires by a participant in the system," *Id.* at 883, but only as long as that perception is a reasonable one. *Id.* at 883 *citing United States v. Johnson*, 14 U.S.C.M.A. 548, 551, 34 C.M.R. 328, 331 (1964) *et al.* The test for apparent unlawful command influence, on the other hand, is whether a reasonable member of the public, if aware of all the facts, would have a loss of confidence in the military justice system and believe it to be unfair. *United States v. Rosser*, 6 M.J. 267 (C.M.A.1979); *United States v. Cruz*, 20 M.J. 873, 890 (ACMR 1985).

Although apparent unlawful command influence may not be found after examination of any one factor, a combination of factors might be sufficient for such a finding. Appellant claims that this Court can find apparent unlawful command influence by looking at the actions of all the participants in his court-martial proceedings prior to assembly. He reiterates, for example, the Secretary's ALNAV changing the method of referral of cases involving national security; his control over pretrial agreements; the conversations between the convening authority's staff judge advocate and the Deputy Judge Advocate General, and the Deputy Judge Advocate General and the Chief Judge concerning the sentencing leniency of the trial judge who they anticipated would be detailed to preside; the replacement of that anticipated trial judge, Judge Reed, with Judge Roberts; and the trial judge's denial of various defense motions. Thus, appellant argues, in effect, that there is an implicit threat of unlawful command influence in this combination of "coincidences."

In a system of justice operating within a well-defined and fairly cohesive community, the mere threat of command influence may be as debilitating to the system as its actual presence. If respect for the justice system is a key factor in military morale and discipline, the fact that the system appears vulnerable to command pressures may be as damaging as the occasional exercise of such pressures. Individuals react to phenomena, after all, on the basis of their perceptions of those phenomena.

H. Moyer, *Justice and the Military*, § 3–400 (1972) cited in *United States v. Rosser*, 6 M.J. 267, 273 n. 19 (C.M.A.1979).

In sum, then, whether an accused has been denied a fair trial due to unlawful command influence "is *not* merely whether such influence *actually* existed but whether there is an appearance of such influence. The appearance of the evil of command influence is as much to be avoided as the actual use of such influence." *United States v. Rodriguez*, 16 M.J. 740, 742 (AFCMR 1983); *United States v. Rosser*, 6 M.J. 267 (C.M.A.1979); *United States v. Rosa*, 46 C.M.R. 480 (NCMR 1972). A presumption, although a rebuttable one, of prejudice exists where there is an appearance of unlawful command influence. *United States v. Crawley*, 6 M.J. 811 (AFCMR 1978).

The accused bears the burden of raising the issue of unlawful command influence. He does so by establishing the existence of at least the appearance of unlawful command influence. *See United States v. Rosser*, 6 M.J. 267 (C.M.A.1979). Mere assertions or speculation without some supporting evidence are not sufficient to raise the issue. Although we find no case that directly states what amount or type of evidence is sufficient to raise the issue, our review of precedent reveals that in each reported case the defense had some specific direct or circumstantial evidence— something other than coincidence—that some specific incident occurred that directly involved the appellant's own trial.[10] We

---

**10.** *E.g., United States v. Rosser,* (member of the accused's court-martial concealed his conversa-

tion with the accused's commanding officer prior to trial); *United States v. Thomas,* (statement

conclude after reading *United States v. Johnson*, 14 U.S.C.M.A. 548, 34 C.M.R. 328 (1964); *United States v. Thomas*, 22 M.J. 388 (C.M.A.1986) *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987); and, in light of Judge Cox's concurring opinion in *United States v. Levite*, 25 M.J. 334, 341 (C.M.A.1987), that the accused's burden includes (1) "asserting the facts of his allegation with sufficient particularity and substantiation so that if true, any reasonable person can only conclude that unlawful influence existed"; (2) declaring that the proceedings were unfair; and (3) showing that the unlawful command influence was the proximate cause of that unfairness. *Levite*, 25 M.J. at 341. But, under current judicial precedent, the accused is still not required to show specific prejudice. *Id.* The accused need only show sufficient evidence that raises a presumption of the existence of unlawful command influence. *Johnson*, 34 C.M.R. 328. Once it bears that burden, the presumption is ripe for rebuttal and the burden shifts to the Government to demonstrate that unlawful command influence does not exist or did not prejudice the accused. Similarly, the Government must produce more than mere assertions of impartiality by the person alleged to have been influenced. *Rosser*, 6 M.J. at 272. In fact, statements made by subordinates that they were not influenced are "inherently suspect, not because of the credibility of the witness but because of the difficulty of the subordinates in ascertaining for himself the effect of any attempted command influence." *Id. United States v. Zagar*, 5 U.S.C.M.A. 410, 414, 18 C.M.R. 34, 38 (1955); *United States v. Adamiak*, 4 U.S.C.M.A. 412, 419, 15 C.M.R. 412, 419 (1954). The same principles would seem to apply to situations concerning the existence of unlawful command influence upon a military judge, *see United States v. Sherrod*, 26 M.J. 30 (C.M.A.1988); *United States v. Ledbetter*, 2 M.J.

37 (C.M.A.1976); court members, *see United States v. Brice*, 19 M.J. 170 (C.M.A. 1985); or convening authority. *See United States Rivera*, 12 U.S.C.M.A. 507, 31 C.M.R. 93 (1961); *United States v. Betts*, 12 U.S.C.M.A. 214, 30 C.M.R. 214 (1961). If the evidence supports a factual basis for the allegation, the Government must rebut the existence of unlawful command influence by clear and convincing evidence. *Rosser; United States v. Jones*, 30 M.J. 849 (NMCMR 1990). We will evaluate the facts and the applicable law in relation to the various stages of the pretrial, trial and post-trial proceedings at which the appellant claims unlawful command influence existed.

### a. *Referral*

Although the Secretary may limit the jurisdiction of those officers having inherent authority to convene courts-martial under Articles 22(a) and 23(a), UCMJ, in the manner in which he did, he could not interfere with their exercise of discretion once a case came within their jurisdiction. *Id.* at 22, citing Article 37(a), UCMJ. The decision to refer charges to a court-martial, the level of the forum and any other aspects concomitant with that authority, are functions of the office of convening authority and matters entirely within the discretion of the convening authority. *United States v. Williams*, 6 U.S.C.M.A. 243, 19 C.M.R. 369, 371 (1955). That discretionary decision is subject to review only for an abuse of discretion. *United States v. Fleming*, 7 U.S.C.M.A. 543, 23 C.M.R. 7 (1957). Thus, the discretion of a convening authority may be limited, but once he is entitled to exercise discretion that exercise must be without interference. Therefore, the Secretary of the Navy could limit Commander Naval Air Forces Pacific in his authority to convene a court-martial in appellant's case, but he could not direct COM-

of convening authority to officers and noncommissioned officers of his command (the members of appellant's court-martial and his potential defense witnesses being among them) that he "found it paradoxical for a unit commander" to recommend trial by court-martial authorized to adjudge a punitive discharge and then testify

as a character witness for the defense); *United States v. Levite,* (officers and noncommissioned officers of accused's command made it clear to witnesses for the defense on the merits and on sentencing that they should not testify for the accused).

NAVAIRPAC to exercise his discretion in any particular way once the case was in COMNAVAIRPAC's hands. COMNAVAIRPAC's decision to refer the appellant's case to a general court-martial was within his discretion as a convening authority and is subject to review for abuse of that discretion.

Appellant claims that promulgation of the JAGMAN changes was an exercise of unlawful command influence upon appellant's convening authority, COMNAVAIRPAC, by the Secretary because the provision in question required the substitution of the Secretary's judgment for the convening authority's in deciding whether to refer appellant's case to a general court-martial and to approve appellant's offer of a pretrial agreement. Appellant also implies that the convening authority referred appellant's case to general court-martial because he was attuned to "the real message contained in such directives and policy suggestions...." He further contends that the Secretary's limitation on the exercise of clemency under Article 74 interfered with the convening authority's independent responsibility to take clemency.

■■■■■ Where any doubt exists as to the presence of unlawful command influence in a case, the doubt must be resolved in favor of the accused. *United States v. Kitchens*, 12 U.S.C.M.A. 589, 31 C.M.R. 175 (1961). Where the Government fails to bear its burden in rebutting the presumption and unlawful command influence is thus found to exist, the Government must bear the additional burden of rebutting the presumption that the accused was deprived of a fair trial. *United States v. Thomas*, 22 M.J. 388, 396 (C.M.A.1986). Even where unlawful command influence is found to exist, the Government can successfully bear its heavy burden in various ways, including demonstrating that the members completely disregarded the improper influence, such that "there is no reason to conclude that the accused was deprived of a fair trial." *United States v. Johnson*, 14 U.S.C.M.A. 548, 551, 34 C.M.R. 328, 331 (1964) citing *United States v. Wood*, 13 U.S.C.M.A. 147, 32 C.M.R. 217 (1962). Finally, upon review of any issue involving assertions of unlawful command influence, this Court must be convinced beyond a reasonable doubt that the findings and sentence have not been affected by the unlawful command influence before we may affirm any findings and sentence. *Levite*, 25 M.J. at 341; *Thomas*, 22 M.J. at 394.

■■■■ The Court of Military Appeals and the courts of military review have considered several factors in determining whether the evidence supports a conclusion that unlawful command influence exists in any particular case: (1) the timing of the contact, *e.g.*, the proximity of contact to the accused's case, *United States v. Zagar*, 5 U.S.C.M.A. 410, 415, 18 C.M.R. 34, 39 (1955); (2) who made the contact, *e.g.*, the position of the officer alleged as attempting the influence, *e.g.*, convening authority, staff judge advocate, trial counsel, witness, or higher authority, *id.*; (3) the type of contact, *e.g.*, speech, letter, memorandum, or directive, *id.*; *United States v. Brice*, 19 M.J. 170 (C.M.A.1985); *United States v. Albert*, 16 U.S.C.M.A. 111, 36 C.M.R. 267 (1966); *United States v. Isbell*, 3 U.S.C.M.A. 782, 14 C.M.R. 200 (1954); *United States v. Littrice*, 3 U.S.C.M.A. 487, 13 C.M.R. 43 (1953); *United States v. Treakle*, 18 M.J. 646 (ACMR 1984); (4) the content of the contact, *e.g.*, what and how it was said, whether mandatory, discretionary, informational, *United States v. Miller*, 19 M.J. 159 (C.M.A.1985); *United States v. Betts*, 12 U.S.C.M.A. 214, 30 C.M.R. 214 (1961); *United States v. Blaylock*, 15 M.J. 190 (C.M.A.1983); *United States v. Rivera*, 12 U.S.C.M.A. 507, 31 C.M.R. 93 (1961); (5) who was contacted—witnesses, court members, military judge, members of the command, *United States v. Ledbetter*, 2 M.J. 37 (C.M.A.1976); *United States v. Kitchens*, 12 U.S.C.M.A. 589, 31 C.M.R. 175 (1961); (6) the reasonable likelihood of prejudice to the accused at his trial. *United States v. Yslava*, 18 M.J. 670 (ACMR 1984) (*en banc*).

■■■■ Looking into the law amplifying some of those factors, we find that a person who is a convening authority, or the superior of a convening authority, may is-

sue directives and announce policies for adherence by subordinates as long as those directives do not require the convening authority to abdicate his independent judgment while performing his court-martial responsibilities. *United States v. Betts*, 12 U.S.C.M.A. 214, 30 C.M.R. 214 (1961); *United States v. Rivera*, 12 U.S.C.M.A. 507, 31 C.M.R. 93 (1961).

A convening authority must be impartial and independent in exercising his authority under the Code. The very perception that a person exercising this awesome power is dispensing justice in an unequal manner or is being influenced by unseen superiors is wrong. We must insure our system of justice is free from even the appearance of command influence. *See generally United States v. Brice*, 19 M.J. 170, 172 n. 3 (C.M.A.1985) (principal opinion); *United States v. Rosser*, 6 M.J. 267, 273 n. 19 (C.M.A.1979).

. . . . .

A typical general or flag officer exercising convening authority power will almost always have superiors, higher-ranking military officers or civilians in policy positions. These superiors as well must refrain from sending signals down the chain of command as to expected results in a criminal case. Real or perceived policy considerations in the operation of military departments have no place in determining the guilt or innocence of an individual charged with a crime under the laws of our land. Superior commanders and staff officers, as well as military or civilian legal officers, must never, directly or indirectly, interfere with a convening authority's exercise of his lawful duty. The convening authority must make his or her own decision on the case. It is not only unprofessional but a fraud on the system for a superior to "send the word" down to a convening authority as to a desired result in a criminal case which will please the leadership of our armed forces.

*United States v. Hagen*, 25 M.J. 78, 86–88 (C.M.A.1987) (Sullivan, J., concurring) *cert. denied* 484 U.S. 1060, 108 S.Ct. 1015, 98 L.Ed.2d 981 (1988).

 Appellant fails to cite with any particularlity the areas in which the convening authority was influenced in the exercise of his discretion by the Secretary's actions. For example, except for pure speculation or indications of coincidence, appellant presented no evidence to show any nexus between the Secretary's actions in promulgating the ALNAV and the convening authority's decision to refer appellant's case to a general court-martial; or to reject appellant's offer of a pretrial agreement; or to deny him clemency.

As additional support for his proposition that the Secretary exercised unlawful command influence by means of the regulation, the appellant alludes to the "Policy Guidance" provision within the ALNAV:

Offenses described in subsection 0149A(2)(A) generally involve incidents which have the potential for serious and irreparable damage to the national security of the United States, and therefore *should ordinarily be referred to trial by general court-martial* if referral of charges is warranted at all. This guidance is not intended to impose any limitations on the full and free exercise of discretion by the convening authority in determining the appropriate disposition of any particular case. (Emphasis added.)

We presume that appellant believes "should ordinarily" supports his theory that the convening authority was thereby required by the Secretary to refer his case to general court-martial. Upon reading the provision as a whole, we find that the language is discretionary and not mandatory.[11]

Appellant's own sworn statement admitting to the disclosure of unspecified classified information and his apprehension while

11. The fact that the ALNAV provisions were promulgated almost simultaneously with the decisions in appellant's case, without more than concidence being demonstrated, is insignificant. We note that the regulation had been in staffing for some time, well before the acts that led to this case. Any new regulation that is promulgated may or may not be propitious for individuals affected by its provisions at the time of its promulgation.

in unauthorized possession of a message classified SECRET revealed a *prima facie* case of, at a minimum, two general orders (general orders that prescribe the handling of classified information within the Department of the Navy) violations, the maximum punishment for which included a dishonorable discharge and four years confinement, a maximum punishment within the authorized jurisdiction of a general court-martial. The offenses are serious and involve national security matters regardless of the definition established by the Secretary. We find that, without evidence to the contrary, the convening authority's referral of the charges to a general court-martial was not an abuse of discretion.[12]

Although we find the referral valid on its face, we will address the appellant's assertions relating to unlawful command influence, an issue that obviously goes beyond the face of the referral document. Assuming, arguendo, that the defense sufficiently raised the issue of unlawful command influence, the Government sufficiently rebutted the presumption that it existed by the clear and positive evidence of Captain Powell's unobjected to and uncontradicted testimony indicating that the convening authority felt no pressure from the Secretary to make any particular decision in appellant's case; the convening authority understood the he was free to act on appellant's case as he believed, in the exercise of his discretion, was appropriate. The policy guidance of the ALNAV confirms that understanding.

Absent some specific evidence indicating that the Secretary of the Navy personally interfered with the convening authority's personal exercise of discretion in making the decision to refer appellant's case to a general court-martial, or directed the convening authority, his subordinate, to act as his *alter ego*, the issue of unlawful command influence is not raised; and, the referral and convening of the court were valid.

### b. *Pretrial Agreement*

Pretrial agreements are not matters of statutory creation. Instead, they are matters of presidential prescription published pursuant to the President's Article 36, UCMJ, authority. In R.C.M. 705(a) the President authorized the service secretaries to prescribe limitations on a convening authority's discretion to enter into pretrial agreements with accused. The Secretary of the Navy pursuant to such authority promulgated § 0129 JAGMAN in which he limited the authority of convening authorities to enter into pretrial agreements with those accused whose cases involved national security matters. Section 0129c specifically prohibits a convening authority from entering into a pretrial agreement in a national security case without first obtaining the approval of the Secretary of the Navy.

The issue remains, however, how this limitation interrelates with R.C.M. 705(d)(4), which appears to give to the convening authority the sole discretion to accept or reject an accused's offer to enter into a pretrial agreement. The law is unsettled in this area. One argument is that the Secretary's authority under R.C.M. 705(a) to prescribe rules for pretrial agreements does not include authority to limit presidential authority, R.C.M. 705(d)(4), for a convening authority to exercise his sole discretion to accept or reject a pretrial agreement offered by an accused. Thus, arguably, the Secretary cannot require a convening authority to obtain the Secretary's approval before entering into a pretrial agreement with an accused.

On the other hand, a plain reading of Rule for Courts–Martial 705(a) leads to a conclusion that it simply means what it says—that the President authorized the Secretary of the Navy to prescribe limitations on convening authorities to enter into pretrial agreements and that is exactly the authority that the Secretary exercised via § 0129c, JAGMAN. This exercise of power by the Secretary would also comport with

---

**12.** Therefore, even if we were to find that the convening authority was influenced unlawfully by the Secretary to refer the appellant's case to a general court-martial, the unlawfulness would be harmless since the offenses are serious, well within the jurisdiction of a general court-martial, and referral to a general court-martial was the likely result in any case.

other statutory language where Congress contemplated the Secretary wielding broad powers in relation to his department, both on his own and in the name of the President. *See, e.g.,* 5 U.S.C. § 301 (1982) (authorizing the heads of military departments to prescribe regulations for the government of their department). *See also* 10 U.S.C. § 5031 (1982) (describing the general duties and responsibilities of the SEC-NAV for the administration of the Navy). Moreover, although the so-called "alter-ego" theory is technically not a delegation from the President to the Secretary, it can be argued that in an *alter ego* capacity SECNAV acts for the President. *See Dunmar v. Ailes,* 348 F.2d 51, 55 (D.C.Cir. 1965). The President, by administrative practice, is presumed to recognize and approve *alter ego* functions. *See Wilcox v. Jackson,* 38 U.S. (13 Pet.) 498, 513, 10 L.Ed. 264 (1839); *Brownfield v. United States,* 148 Ct.Cl. 411 (1960); *D'Arco v. United States,* 441 F.2d 1173, 194 Ct.Cl. 811 (1971); *Dunmar,* 348 F.2d at 55. Congress recognized the practice, a practical one in today's complex governmental environment, in 3 U.S.C. § 302 (1982), and expressly included in 3 U.S.C. § 302 a "savings clause", which upholds official acts that are presumed-in-law to have been taken by authority or direction of the President.

In the instant case, however, we need not decide this interesting issue of Secretarial power to limit a convening authority's discretion under R.C.M. 705(d)(4), because appellant has failed to show that the Secretarial limitation placed on the convening authority in any way influenced the decision of the convening authority not to accept the pretrial agreement offered by appellant. A convening authority has discretion to accept or reject such offers with or without reasons. Appellant's offer dated 22 June 1987 proposed that he would plead guilty to Specification 8 of Charge I (wrongfully copying and removing secret material) a violation of Article 92, UCMJ, and not guilty to all remaining specifications and charges; and, that he would not require the Government to expend travel funds on witnesses in extenuation and miti-

gation. In return for that plea and non-expenditure of Government funds, the appellant wanted the convening authority to agree that the Government would not present any evidence on the other charges and specifications; approve no punitive discharge; take no adverse administrative action that would adversely affect his military retired pay or any civil service entitlements or benefits accrued to the date of trial; not enter the appellant's written or oral statements to Government personnel into evidence in aggravation unless the court had previously ruled that such statements were admissible on the merits; not present live witness testimony in aggravation of the offenses; approve no restriction or hard labor or confinement in excess of time already served on the date of trial; not take action to effect any reduction of the appellant's rate; approve no forfeitures, fines or other deprivations of pay and allowances; and, grant appellant transactional and use immunity for any information revealed or derived from a polygraph examination to which the appellant agreed to submit. Essentially, the appellant agreed to plead guilty to violation of a general order in return for a punishment no greater than time served in pretrial confinement at the date of trial which at the time the offer was submitted was about seven months. In light of the offenses for which the appellant was originally charged, the evidence the Government had to support the allegations, and the *quid pro quo* the Government was expected to make, the defense failed to show that the rejection of the pretrial agreement by the convening authority was due to the influence of the Secretary of the Navy. The record contains nothing that could indicate that the appellant's offer is objectively reasonable under the facts and circumstances of his case. Without evidence to the contrary, moreover, this Court will not presume that a convening authority has abrogated his responsibility to exercise his own discretion in accordance with the law, particularly when his staff judge advocate testified, without objection, that the convening authority felt no pressure from the Secretary. *See United States v. Masusock,* 1 U.S.C.

M.A. 32, 1 C.M.R. 32 (1951). The convening authority's decision to reject appellant's pretrial agreement offer was not based upon any influence exercised upon him directly or indirectly by the Secretary of the Navy.

### c. Clemency

■ Clemency is a discretionary matter for the convening authority when he takes his action. Articles 60(c)(1) and 71, UCMJ, 10 U.S.C. §§ 860(c)(1), 871. It is also a matter that can be exercised by the Secretary of the Navy or, when designated by him, any Under Secretary, Assistant Secretary, Judge Advocate General, or commanding officer, on unexecuted portions of the sentence, other than a sentence approved by the President. Article 74, UCMJ. Clemency includes the remission or suspension of any part or amount of the unexecuted part of any sentence, including all uncollected forfeitures. *Id.* Article 74, UCMJ. Clemency requires no reason. Rules for Courts–Martial 1107(a) and (b)(1) reiterate that the convening authority's action on findings and sentence, including clemency, is a matter within his sole discretion. *Cf.* R.C.M. 1105(b)(4). Appellant contends that the Secretary of the Navy interfered with the convening authority's exercise of his clemency discretion by promulgating § 0149 JAGMAN. Our reading of that section, however, reveals that the Secretary merely limited the exercise of Article 74(a), UCMJ, authority. A convening authority has the discretion to exercise clemency when he takes his initial action approving the findings and sentence pursuant to Article 60, UCMJ. Clemency exercised pursuant to Article 60 authority is not the clemency authority limited by Article 74. By promulgating § 0149 of the JAGMAN, the Secretary merely reserved to himself, as he might under Article 74, supplemental clemency authority in national security cases. He did not, in any way, limit the convening authority's Article 60 initial clemency authority.

■ Furthermore, contrary to the appellant's assertions, we believe the convening authority had no misapprehension about whether he could take clemency action in appellant's case at the time he took action on the case under Article 60. The staff judge advocate, in his R.C.M. 1106 recommendation submitted pursuant to another review ordered by this Court (28 M.J. 610 (NMCMR 1989)), advised the convening authority that he could take clemency and that the secretarial limitation on clemency did not include him when he took his action under Article 60, UCMJ. Therefore, we find that the convening authority was not prohibited, and did not believe he was prevented, from exercising clemency in appellant's case when he took his convening authority's action.

Accordingly, we find that the appellant's evidence was insufficient to raise the issue of unlawful command influence by the Secretary of the Navy on the convening authority. Alternatively, if the evidence were sufficient to raise the issue, then we are convinced that the Government rebutted its existence by clear and positive evidence. Regardless, we are convinced beyond a reasonable doubt that the Secretary's actions did not affect any of the decisions made by the convening authority in appellant's case.

### B. Command Control

Our resolution of the allegation of secretarial control does not end our discussion of the unlawful command influence issue, however, because appellant describes a situation that occurred during the trial that reflects on the possible influence exercised by others subordinate to the Secretary upon the military judge, influence reflecting command control. Here, we refer to appellant's allegation of undue influence exercised by the staff judge advocate, Captain Powell, upon the detailing of the military judge to appellant's court-martial. Specifically, appellant established through the testimony of Captain Powell and the interrogatories of Captain Byrne, the Chief Judge of the Navy–Marine Corps Trial Judiciary, that senior judge advocates in attendance at a Pacific legal conference and the trial counsel in appellant's case were concerned about the leniency of judges in the Southwest Judicial Circuit and, in particular, Judge Reed. The senior judge advocates brought their concern to the atten-

tion of the Judge Advocate General of the Navy during the Pacific legal conference but were properly rebuffed by him.

Subsequent to the rebuff by the Judge Advocate General, however, Captain Powell called the Deputy Judge Advocate General and discussed the same concern with him. The Deputy Judge Advocate General in turn called Captain Byrne, who likewise rebuffed the concern. On the other hand, Chief Judge Byrne thereafter detailed Judge Roberts to appellant's case despite the disagreement of Circuit Judge Donato who told the Chief Judge that he had already planned to detail Captain Reed to appellant's case and that Captain Reed was fully capable and well-experienced. Shortly after Judge Roberts was detailed by the Chief Judge, the Chief Judge replaced him with Judge Reed when another arguably more significant national security case was ready for trial.

In the answers to the interrogatories posed to him, the Chief Judge explained the procedures he used when he detailed Captain Roberts and Captain Reed to preside at appellant's court-martial as follows. The military judge who had been specially designated to preside in cases involving national security since 1984 was going to retire in June of 1987. The Chief Judge, therefore, decided to fill the position with Captain Roberts and, in anticipation of that event, had initiated a request for Captain Roberts to be cleared at the SCI level. During this same period, the Chief Judge had been alerted to the fact that a number of national security cases were in the pretrial stages. With this potential increase in the number of national security cases and as docketing schedules began to conflict, the Chief Judge requested SCI clearance for two other general court-martial judges. In the meantime, one of those potential cases, United States v. Lonetree, to which the Chief Judge had decided to detail Captain Roberts before appellant's case arose, was referred to general court-martial while appellant's case was still being tried. The Chief Judge removed Judge Roberts from appellant's court-martial and detailed him to Lonetree because he considered it "the more significant of the two cases from a national security standpoint." The Chief Judge then consulted with the Circuit Military Judge, Captain Donato, who had intended to detail Captain Reed to appellant's case in the first instance, about whom he should detail. Captain Donato again recommended Captain Reed. The Chief Judge detailed Captain Reed to preside over the remainder of appellant's court-martial.

Then, during the early course of the trial when Judge Reed was presiding, Captain Powell contacted Judge Reed and expressed to him his hope that Judge Reed would stick to the trial schedule because the command could not afford to pay witnesses who were waiting to be called to testify but could not because of trial delay. Judge Reed on his own initiative brought the nature of his contact with Captain Powell to the attention of the parties during an Article 39(a) session. He submitted to forthright *voir dire* on the disclosed communication but refused to recuse himself. He stated that he was not influenced by Captain Powell's comments nor the events leading to his being detailed as the military judge in appellant's case. Later he denied various defense motions, including a motion for a continuance. (The propriety of the military judge's ruling on those motions will be discussed *infra.*)

Appellant asserts that these facts support a finding that the military judge was the subject of actual unlawful command influence and that as a result of that influence the military judge:

(a) denied the most significant witnesses on the command influence motion (Captain Byrne, Former Secretary Lehman, Secretary Webb, and Lieutenant Colonel Powell);

(b) denied most of the defense-requested out of-area witnesses;

(c) denied a continuance to consult with an expert witness on Philippine counter-intelligence matters; and

(d) denied an impartial forum because the military judge refused to recuse himself although he was a percipient witness to the command influence issue, his initial appointment to the case was flawed since it came as a result of the improper special

judge program, and he labored under a severe conflict of interest since the command influence issue involved ruling on what amounted to criminal conduct by his superiors in the chain of command in appointing him to sit on the case.

Additionally, appellant asserts that:

(e) a strong suspicion of manipulation was present because of the sudden new special judge program and the "flip-flop" of judges;

(f) the military judge was precluded from giving adequate and serious consideration to the 24 written pretrial motions presented by the defense; and

(g) neither the accused nor any member of the public can have confidence in the integrity of the military justice system because of the appearance of gross impropriety in the manipulation of the forum. These rulings by the military judge, asserts the appellant, are evidence of the existence of actual, or at the very least, apparent command influence that adversely affected the outcome of his case.

Upon review of the record of trial in light of these specific assertions, we find, as to assertion (e), no unlawful command influence; as to assertion (f), unlawful command influence is not even raised because no evidence to support the assertion was produced; and, as to assertions (a)-(d), we address those assertions separately *infra* since the appellant identified them as specific assignments of error. Assertion (g) is really a conclusion of law the appellant draws from assuming assertions (a)-(f) are true. As a result of our resolution of those assigned errors, *infra*, we specifically find: (1) the Secretary did not exercise unlawful command influence when he promulgated the JAGMAN changes establishing guidelines and requiring specific processing considerations in cases involving national security or the Special Judge Program; (2) the decisions made by the convening authority in appellant's case were based upon the convening authority's exercise of discretion independent of any actual or perceived secretarial mandate; (3) even if we assumed that the Secretary of the Navy did exercise unlawful command influence in ap-

pellant's case, we find no evidence that he made any direct or indirect attempt to orchestrate the findings and sentence portion of the court-martial proceedings themselves. *Cf. United States v. Levite*, 25 M.J. 334 (C.M.A.1987); *United States v. Cruz*, 25 M.J. 326 (C.M.A.1987). His efforts, if any, were directed solely at the referral and other pretrial aspects of the proceedings. Since we find that the critical fact-finding and sentencing stages of the court-martial were untainted by his efforts, no nexus exists between the results of the the appellant's court-martial and any unlawful command influence that might have existed. In other words, we do not find any evidence that appellant's court-martial was unfair or that unlawful command influence was the proximate cause of the outcome of the appellant's court-martial. We are convinced beyond a reasonable doubt that the findings and sentence are unaffected by unlawful command influence and were impartially arrived at; appellant was not denied a fair trial as a result of any of the Secretary's or convening authority's actions.

 Likewise, we find that although the military judge was the subject of improper *ex parte* communication, he was not the subject of unlawful command influence because he did not perceive it to be and his rulings, having been properly made, refute clearly and positively any evidence that might support a finding that the issue had been sufficiently raised. *Cf. United States v. Soriano*, 20 M.J. 337 (C.M.A.1985). Upon review of the record of trial as a whole, including the propriety of the military judge's actions, we are also convinced beyond a reasonable doubt that a reasonable member of the public, knowing all the facts, would have confidence in the outcome of appellant's trial. We find as a result that apparent unlawful command influence was *not* present in appellant's case. In all regards we are convinced beyond a reasonable doubt that the appellant was not denied a fair trial.

## II. DISQUALIFICATION/RECUSAL

Appellant contends that the military judge erred by presiding at his court-mar-

tial because (1) he was disqualified from sitting due to the circumstances surrounding the unlawful command influence issue; and (2) he should have recused himself when he became a witness in the case as the result of his private communication with the staff judge advocate, Captain Powell. We find, based on our reasoning below, that the military judge was not disqualified from presiding at appellant's court-martial nor should he have recused himself.

Appellant asserts, before us as he did at trial, that the military judge could not impartially rule on the defense motion to dismiss the charges on the ground of unlawful command influence for five reasons. First, the military judge would have to rule on whether the perception that he was a light sentencer affected his ability to conduct appellant's trial. Second, regardless how the military judge ruled, his rulings would either be perceived "as too harsh—to counteract the image of being too lenient—or ... too lenient—to counteract the notion that [he] had become tougher to offset the image of leniency." Third, the military judge was in an untenable position because he would have to evaluate the credibility of his immediate superior, Captain Donato, against the credibility of Captain Byrne, Captain Donato's immediate superior and the Chief Judge, the superior in the chain of command of both himself and Captain Donato. Fourth, because the conduct of the former Deputy Judge Advocate General was a subject of the motion, no Navy trial judge could hear the motion. In fact, said appellant, the only one who could sit in judgment on the Deputy Judge Advocate General's conduct was the Judge Advocate General himself. The defense restated its concern on review in very broad terms:

The challenge the defense is raising deals not only with government overreaching in this particular case, but with government overreaching in the very process by which judges are chosen to sit in these most important of all cases, national security cases. The defense is of the opinion that the very independence of the judiciary itself is compromised by the existence of this super-judge program.

Fifth, the military judge simply appeared to lack the independence to decide the case fairly. The defense invited the Government during the early stages of the trial to join in its request that the military judge stay the proceedings and concur with the defense request for the Court of Military Appeals to appoint a Special Master to look into the issue of unlawful command influence. The Government did not concur; but, it did ask the military judge if he was aware of any matters which might form the basis of a challenge for cause against him and if so to state them for the record. The military judge stated he knew nothing that would form a basis for a challenge for cause. The military judge denied the defense request to stay the proceedings until the Court of Military Appeals acted on the matter. The Court of Military Appeals denied the defense's petition on 17 July 1987. 24 M.J. 443 (C.M.A.1987) (summary disposition).

During the pre-assembly stage of the proceedings, the military judge did, however, inform the parties that one "factual matter" should be brought to their attention:

[i]n perusing the interrogatories that were sent out, there was a question of Captain Powell—had he had any communication with me, and I don't know what his response was, but I would like to disclose that he called me on the telephone—I think you ought to be aware of that fact—expressing concern over the cost involved in trying this case with delays. My response to him was that any concern that he had as the convening authority should be made through the trial counsel and I would look to the trial counsel to express the—or represent the interests of the government in this matter. That's the only matter that I'm aware of that I think ought to be brought to counsel's attention. As far as that affecting my ability to sit on this case, I don't perceive that it affects me at all in my ability to be fair and independent in my judgement [sic].

The military judge then repeated that he did not believe he saw anything that, in his judgment, would affect his ability to rule on the motion. He further stated that as to the defense's belief that he was in an untenable position because his immediate superior would be a witness as well as his superior's superior:

> I don't feel any inclination to allow the fact that these individuals are senior to me to affect my ability to discern what are the facts with respect to this motion. Now, that would also hold true with respect to any other witnesses that are called here. I think you must recognize that we cannot operate in a vacuum. Any statements that I have heard or seen attributed to people who are connected with this court-martial, quite frankly, I've regarded them as simply that, statements attributed to those individuals, but I have not perceived, at least consciously or—well, consciously of course is the only perception that I would have, how that would interfere with my ability to independently assess the evidence presented on a motion of this nature, and to weigh the credibility of any witnesses that are called, so that I should disqualify myself or grant a stay in this proceeding to allow the Court of Military Appeals to take whatever action is necessary or appropriate.

Appellant's trial defense counsel then indicated that there might be a factual problem in that "you may become a witness as to an attempt, at least, at unlawful command influence by the Staff Judge Advocate for the convening authority. That is an improper contact." The military judge denied the motion to disqualify himself and stated that alternative methods existed for presenting the issue. He also stated that he was not convinced that calling him as a witness was essential in light of the disclosure he had just made to the parties. Captain Powell was called to testify. He basically corroborated what the military judge had informed the parties and disavowed any intent to exercise unlawful command influence. The defense objected to the denial on the grounds that the military judge in ruling on the issue would have to determine the credibility of Captain Powell and would do so based upon information only he was privy to. Therefore, asserted the trial defense counsel, the military judge was a witness in the matter, and as such the Manual for Courts–Martial prohibited him from presiding. Defense then said that the military judge's belief as to whether he would be prejudiced or that he could be impartial was not the issue. The issue really was the "process of your appointment, and ... the perception of impartiality." The defense never *voir dired* nor challenged the military judge for cause on the grounds of partiality due to unlawful command influence nor did they call the military judge as a witness on the issue of the private communication.

While the defense acknowledged that the military judge was subject to *voir dire* and did, in fact, subject himself to extensive *voir dire* by the parties on the private conversation—the *ex parte* communication—in question, the appellant contends that the nature of posing *voir dire* is substantially so different from cross-examination that he was prevented from eliciting the complete picture of the incident.

The Court of Military Appeals has held that a military judge who is disqualified to sit as a judge alone is also disqualified to sit with members. Additionally, when a military judge is disqualified, all of his actions from the moment of disqualification are void, except those which are immediately necessary for assuring a swift and orderly substitution of judges. *United States v. Sherrod*, 26 M.J. 30 (C.M.A.1988). Thus, if the military judge was disqualified or erred in failing to recuse himself, the fact that the appellant elected to be tried by members does not result in a waiver of the issues.

The appellant specifically asserts on review that the military judge in his case, Captain Reed, erred when he failed to disqualify/recuse himself based on the grounds set forth in R.C.M. 902(b)(1) and (3). It follows, then, that such error, if found, would require us to set aside the findings and sentence and authorize a re-

hearing with a military judge other than Judge Reed.

▆▆▆▆ Article 26(d), UCMJ, 10 U.S.C. § 826(d), prohibits a person from presiding as military judge in any court-martial if he is a witness for the prosecution. The disqualification is self-operating and leaves no discretion in the trial judge. *United States v. Soriano*, 20 M.J. 337, 339 (C.M.A.1985). R.C.M. 902 further defines the grounds for disqualification and recusal; it provides, in pertinent part:

(a) *In general.* Except as provided in subsection (e) of this rule, a military judge shall disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned.

(b) *Specific grounds.* A military judge shall also disqualify himself or herself in the following circumstances:

(1) Where the military judge has a personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts concerning the proceeding.

(2) ....

(3) Where the military judge has been or will be a witness *in the same case....*

(Emphasis added.) This Rule for Court-Martial is based upon 28 U.S.C. § 455 and "does not establish a different test" from that of the Federal statutory provision. Analysis, R.C.M. 902, A21–45, MCM. The goal of the judicial disqualification rule is

to foster the *appearance of impartiality....* [It] stems from the recognized need for an unimpeachable judicial system in which the public has unwavering confidence ... "the protection of the integrity and dignity of the judicial process from any hint or appearance of bias is the palladium of our judicial system." Any question of a judge's impartiality threatens the purity of the judicial process and its institutions. (Citations omitted.)

*Potashnick v. Port City Construction Company*, 609 F.2d 1101, 1111 (5th Cir. 1980), *reh'g* and *reh'g en banc denied* (1980). A judge is presumed to be quali-

fied and so the burden placed upon the party seeking disqualification is substantial in proving otherwise. *State of Idaho v. Freeman*, 478 F.Supp. 33 (D.C.Idaho 1979); *United States v. Baker*, 441 F.Supp. 612 (M.D.Tenn.1977); but, since 28 U.S.C. § 455(a) and R.C.M. 902(a) focus on the appearance of impartiality, a judge ought to consider "how his participation in a given case looks to the average person on the street," *Potashnick*, 609 F.2d at 1111; in other words, "if a reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality," then the judge should disqualify himself. *Id.*

▆▆▆▆ First, we will dispose of the appellant's broad assertion that no one other than the Judge Advocate General could pass judgment on the unlawful command influence issue because the officials involved were so senior that every judge within the Navy–Marine Corps Trial Judiciary was disqualified. Even assuming such an assertion were proven true, the presiding judge, Judge Reed, would not be *per se* disqualified because of the "maxim of law to the effect that where all are disqualified, none are disqualified." *See Turner v. American Bar Association*, 407 F.Supp. 451, 483 (N.D.Ind.1975) (citing *Evans v. Gore*, 253 U.S. 245, 40 S.Ct. 550, 64 L.Ed. 887 (1920)), *aff'd* 542 F.2d 56 (8th Cir.1976). We reject the assertion that Judge Reed was disqualified because he might be required to pass on the credibility of his seniors.[13] "[O]ne's natural sympathies and feelings which may arise during the course of a proceeding (unless they arise to the status of an actual bias or prejudice for or against either party, ...) would not appear to be grounds for disqualification." *Lazofsky v. Sommerset Bus Co., Inc.*, 389 F.Supp. 1041, 1043 (E.D. N.Y.1975). Additionally, "the feelings of defendants which, of necessity, must be subjective, cannot without more be made the test." *Wolffson v. Palmieri*, 396 F.2d 121, 125 (2d Cir.1968); *United States v. Corr*, 434 F.Supp. 408, 413 (S.D.N.Y.1977). The implication of this assertion is that the

13. We judicially note that Judge Reed is a Cap- tain, Judge Advocate General's Corps, U.S. Navy.

military judge would not do so fairly because he had some identified personal interest or bias at stake. We are not willing to find personal interest or bias without some evidence that indicates its presence. "The claim must be supported by *facts* which would raise a reasonable inference of lack of impartiality upon the judge in the context of the issues presented for his consideration." (Emphasis added.) *Corr*, 434 F.Supp. at 413. We find that a military judge's situation is analogous to a court member's situation when asked whether he/she would give more weight to the testimony of a witness because of the fact of the witness' status as an officer or law enforcement official. *See United States v. Ryan*, 21 U.S.C.M.A. 9, 44 C.M.R. 63 (1971). But, absent evidence to the contrary, a military judge, unlike court members, is presumed to know and follow the law. *Cf. United States v. Rosser*, 6 M.J. 267, 272 (C.M.A.1979) *with United States v. Montgomery*, 16 M.J. 516 (ACMR 1983).

We will look next at the assigned error challenging the military judge's failure to recuse himself based on his being a witness to the issue relating to unlawful command influence. If we were to find that the military judge was a witness, then the military judge would be mandatorily disqualified under R.C.M. 902(b)(3). *See In re International Business Machines Corporation*, 618 F.2d 923 (2d Cir.1980). Under the factual circumstances surrounding appellant's court-martial, the position taken in his pleadings, and our review of the law related to the error assigned, we have determined that this assignment can only be resolved by addressing three overlapping concepts of judicial conduct: (1) *ex parte* communications; (2) extrajudicially obtained knowledge of facts involved in the case; and (3) being a witness for the prosecution. Whether the military judge is a witness within the meaning of Article 26, UCMJ, depends upon the resolution of the first two of these concepts. Private *ex parte* communications, possibly prejudicial, between the fact-finder and third persons are "absolutely forbidden" and invalidate the verdict unless their harmlessness is proven. *Mattox v. United States*, 146 U.S. 140, 150, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892). A presumption of prejudice arises in the Federal courts when communications occur between jurors and witnesses; the presumption is rebuttable; the Government bears the burden of showing that the communication was harmless. *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954); *United States v. Adamiak*, 4 U.S.C.M.A. 412, 15 C.M.R. 412 (1954). On the other hand, the Federal courts have also held that an *ex parte* communication between a judge and one of the parties "is not, of itself, a sufficient indication of bias or prejudice to warrant disqualification." *Government of the Virgin Islands v. Gereau*, 502 F.2d 914 (3rd Cir.1974); *United States v. Tropiano*, 418 F.2d 1069, 1077 (2d Cir.1969), *cert. denied*, 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530 (1970). Administrative matters discussed *ex parte*, although inappropriate, do not require reversal unless the accused was prejudiced or the Government advantaged. *See United States v. Brauchler*, 15 M.J. 755 (AFCMR 1983).

The fact that Navy Captain Powell, not the military judge, initiated the private conversation is not disputed. Nor do the parties dispute that the military judge considered the communication inappropriate and quickly ended it with the admonition that he could be made aware of Captain Powell's concerns through the trial counsel's representations on the record during the trial. The substance of the *ex parte* communication, as testified to by Captain Powell, and as represented by the military judge during *voir dire*, was the command's concern about the cost of the trial should it be delayed once scheduled. While the *ex parte* communication was inappropriate on the part of Captain Powell, the military judge acted most appropriately, in the only way he could, to extricate himself from a situation he had not initiated. He notified the parties and subjected himself to *voir dire*. Appellant has not identified with any specificity—except by broad statements based upon mere speculation—how he was actually prejudiced by the *ex parte* communication. We acknowledge that the appel-

lant does make three broad statements, based upon mere speculation, which he cites as prejudice: first, the judge, as a percipient witness to the unlawful command influence issue, denied the appellant his Sixth Amendment rights to cross-examine and confront witnesses which prevented him from developing a record showing actual influence by the chain of command; second, the military judge refused to order the production of Captain Byrne, the Secretary of the Navy, and Lieutenant Colonel Powell (the Marine as distinct from Captain Powell the SJA) on the issue of unlawful command influence; and, third, the military judge refused to grant a continuance to permit the defense to consult with a foreign counter intelligence expert and refused to order production of all but two out-of-area witnesses as a result of Captain Powell's request to hold down witness costs. Defense Brief at 73–74.

Based on our careful scrutiny of the record, we cannot infer from the facts on the record that the *ex parte* communication was in any way motivated by Captain Powell's desire to see the Government prevail on the merits. *See Government of the Virgin Islands*, 502 F.2d at 932. Additionally, the military judge's forthright disclosure of the *ex parte* communication, his submission to extensive *voir dire* on the private communication, the substance of the conversation and its minimal duration, all lead us to conclude that, without more, the evidence clearly and positively shows that the appellant was not prejudiced nor was the Government advantaged by the improper communication. *See United States v. Adamiak*, 4 U.S.C.M.A. 412, 15 C.M.R. 412 (1954); *Brauchler*, 15 M.J. at 755. Furthermore, rulings made by a judge during the course of the proceedings can never serve as a basis for disqualification. *Berger v. United States*, 255 U.S. 22, 34, 41 S.Ct. 230, 233, 65 L.Ed. 481 (1921); *In re International Business Machines Corporation*, 618 F.2d at 929; *United States v. Azhocar*, 581 F.2d 735 (9th Cir. 1978). Rather, the military judge's rulings are evaluated on their own merits. Thus, we find no prejudice to the appellant although we in no way condone the unprofes-

sional conduct of the staff judge advocate in initiating the *ex parte* communication with the judge.

The second step in our analysis of disqualification is based on R.C.M. 902(b)(1), which states that a military judge is required to disqualify himself if he has "personal knowledge of disputed evidentiary facts concerning the proceeding." Facts learned by a judge in his judicial capacity cannot serve as the basis for disqualification. *United States v. Patrick*, 542 F.2d 381 (7th Cir.1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977). Certainly, the military judge had personal knowledge of his conversation with Captain Powell and thus personal knowledge of the content of that conversation. Furthermore, that knowledge involved facts concerning the proceeding. He knew the circumstances surrounding the appellant's pretrial motions, including the allegation of unlawful command influence that was pending his decision at the time of the *ex parte* communication by Captain Powell. He also knew about the alleged involvement of Captain Powell in that issue. As a result, the motive for and the perceptions of the conversation became inextricably entwined with the pending defense allegations of unlawful command influence or its appearance. But, personal knowledge does not equate to personal interest. Without a factual basis supporting a showing of personal interest and due to the undisputed subject of the *ex parte* communication and its direct relationship to the proceedings then pending before the military judge, we conclude that the *ex parte* communication and any knowledge gained as a consequence thereof by the judge was gained in a judicial rather than an extrajudicial capacity. As a result of this conclusion, in combination with our finding that the facts are not disputed, we hold that the defense did not provide a reasonable factual basis for disqualification and the military judge was not mandatorily disqualified on R.C.M. 902(b)(1) grounds. See *United States v. Soriano*, 20 M.J. 337 (C.M.A.1985); Abramson, *Judicial Disqualification under Can-*

on *3C of the Code of Judicial Conduct,* (American Judicature Society, 1987).

 Turning to the third step, we find that R.C.M. 902(b)(3) requires disqualification or recusal if the military judge *has been or will be a witness* in the same case. R.C.M. 902(b)(3) differs slightly from the Federal statute in that the latter is more narrow. The Federal statute, 28 U.S.C. § 455(b)(3), disqualifies a judge who *is or has been a material witness* in the case. A judge may not predicate a judicial determination based upon his own knowledge. *United States v. Head,* 2 M.J. 131, 134 (C.M.A.1977); *cf. In re Murchison,* 349 U.S. 133, 138–139, 75 S.Ct. 623, 626–27, 99 L.Ed. 942 (1955). If he does so, he becomes a witness and must be disqualified. *United States v. Conley,* 4 M.J. 327 (C.M.A.1978); *United States v. Duvall,* 7 M.J. 832 (NMCMR 1979); *accord United States v. Jamison,* 18 M.J. 540 (ACMR 1984). On the other hand, the fact that a judge becomes "aware of certain factual circumstances does not *necessarily* mean that he is disqualified...." *United States v. Bradley,* 7 M.J. 332, 334 (C.M.A.1979). In appellant's case, the disqualification issue revolves around whether the judge made his decision on the motion for his disqualification based upon what he himself factually knew about the content of the conversation he had with Captain Powell, the staff judge advocate of the convening authority, rather than solely upon the evidence presented on the motion by both parties. As we review the Powell testimony and the entire record before the military judge at the time that Captain Powell testified, we have no reason to believe that the military judge did in fact or had to make a determination with respect to Captain Powell's credibility based upon his own knowledge of what transpired during the private conversation. Appellant has presented no support for his inference that the military judge used his own knowledge in arriving at his findings. As we previously stated in *United States v. Smith,* 30 M.J. 631 (NMCMR 1990):

> At the trial level *voir dire* should expose a ground for challenge of a military judge, if one exists, and result either in

the assignment of a different military judge to hear the case, or if the challenge is improperly denied, create a record, which an appellate court may review to determine if an abuse of discretion has occurred. *United States v. Jarvis,* 22 U.S.C.M.A. 260, 46 C.M.R. 260 (1973). A military judge, like any other Federal judge, is required to disqualify himself in any proceeding in which his impartiality might reasonably be questioned.... We must demand forthright disclosures and responses.

The military judge submitted to extensive *voir dire,* there was extensive direct and cross-examination of Captain Powell, and the military judge made specific findings of fact relating to the private conversation and his own judicial conduct. The military judge found that he was not a witness and that the *ex parte* communication dealt solely with administrative matters relating to costs to the command should the trial be delayed and that he was not influenced if Captain Powell had intended to attempt to do so, which, in itself, was defense speculation. Great weight must be given to a judge's disclaimer and he is presumed to act in accordance with the law. *United States v. Montgomery,* 16 M.J. 516 (ACMR 1983); *see United States v. Olander,* 584 F.2d 876 (9th Cir.1978); *United States v. Azhocar,* 581 F.2d at 738; *United States v. Mitchell,* 377 F.Supp. 1312, 1315–16 (D.D.C.1974). Again, absent a showing to the contrary, we find that the defense failed to establish a sufficient factual basis to indicate that the military judge was a witness and therefore disqualified under R.C.M. 902(b)(3).

 Despite the fact that a judge may not be disqualified under R.C.M. 902(b), he may still be disqualified under R.C.M. 902(a) if his impartiality might reasonably be questioned. *See United States v. Baker,* 441 F.Supp. 612 (D.C.Tenn., 1977). Since 28 U.S.C. § 455(a) and R.C.M. 902(a) focus on the appearance of impartiality, a judge ought to consider "how his participation in a given case looks to the average person on the street"; *Potashnick,* 609 F.2d at 1111; in other words, "if

a reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality" then the judge should disqualify himself. *Id.* Claims of judicial partiality must have a factual basis. *In re United States*, 666 F.2d 690, 695 (1st Cir.1981); *United States v. Cowden*, 545 F.2d 257, 265 (1st Cir.1976), *cert. denied*, 430 U.S. 909, 97 S.Ct. 1181, 51 L.Ed.2d 585 (1977). The factual basis must be reasonable, *United States v. Cepeda Penes*, 577 F.2d 754 (1st Cir.1978), and the party moving for disqualification bears the burden of establishing that reasonable factual basis. *Id.* "Although public confidence may be as much shaken by publicized inferences of bias that are false as by those that are true, a judge considering whether to disqualify himself, must ignore rumors, innuendoes, and erroneous information published as fact in newspapers." *In re United States*, 666 F.2d at 695. More is required than "mere surmise and conjecture; the defendant must be able to point to some behavior on the part of the judge suggesting that there is, in fact, some friction between the judge and the complaining party—not a mere disagreement over the state of the law on any given point." *Cepeda Penes*, 577 F.2d at 758. Only if the facts establish what "an objective, knowledgeable member of the public would find to be a *reasonable basis* for doubting the judge's impartiality" is disqualification appropriate. *In re United States*, 666 F.2d at 695. (Emphasis added).

■ The "duty to sit" rule was eliminated by 28 U.S.C. § 455, but a judge must still sit "unless some reasonable factual basis to doubt the impartiality or fairness of the tribunal is shown by some kind of probative evidence." *Blizard v. Frechette*, 601 F.2d 1217, 1221 (1st Cir.1979). Although the judge is presumed to be impartial until the party challenging that impartiality presents evidence showing that the judge falls within the mandatory criteria for disqualification, *Matter of Horton*, 621

F.2d 968 (9th Cir.1980), the judge must ensure that his presence on the bench has the appearance of detached impartiality. *Id.* "Although a judge must disqualify himself under appropriate circumstances, the legislative history of § 455(a) indicates that the court must act with deliberation and caution." *In re Matter of Searches Conducted on March 5, 1980*, 497 F.Supp. 1283 (E.D.Wis.1980). The analysis of the claim, the balancing of policies, and deciding disqualification are the responsibility of the judge and he has a range of discretion in making such a decision. *In re United States.* A judge's impartiality might reasonably be questioned because of the judge's familiarity with matters in dispute, and facts that the judge came upon in his judicial rather than personal capacity, which though not dispositive, have relevance to analyzing the appearance of impartiality. *United States v. Coven*, 662 F.2d 162 (1st Cir.1981), *cert. denied*, 456 U.S. 916, 102 S.Ct. 1771, 72 L.Ed.2d 176 (1982).

■ The test a military judge must apply in determining whether to recuse himself is "whether the objective, reasonable man with knowledge [14] of all the circumstances would conclude that the trial judge's impartiality might reasonably be questioned." R.C.M. 902(a); *Hall v. Small Business Administration*, 695 F.2d 175 (5th Cir.1983); *Markus v. United States*, 545 F.Supp. 998 (S.D.N.Y.1982). This is an objective test that assumes the facts as alleged are true and then looks into the mind of a reasonable man rather than the mind of the judge or the parties. *United States v. Sherrod*, 22 M.J. 917, 920 (ACMR 1986), *rev'd on other grounds*, 26 M.J. 30 (ACMR 1988) (quoting *United States v. Martinez*, 19 M.J. 652, 654 (ACMR 1984), *pet. denied*, 21 M.J. 27 (C.M.A.1985)); *United States v. Smith*, 30 M.J. 631 (NMCMR 1990); *Davis v. Board of School Commissioners of Mobile County, et al,*

---

**14.** "But knowledge of all the facts implies only knowledge of those that are objectively ascertainable. The term cannot ... extend to what happens in the judge's chambers or to his actual virtue because were that so, the test would not be the appearance of impartiality but the absence of actual prejudice." *Hall v. Small Business Administration*, 695 F.2d 175, 179 (5th Cir. 1983).

517 F.2d 1044, 1044, 1052 (5th Cir.1975) (*reh'g* and *reh'g en banc denied,* 1972). Indeed, this law on disqualification is substantially identical to the judicial precedent interpreting paragraph 62 f(13), MCM, 1969 (Rev.), the predecessor provision to R.C.M. 902(a):

> "a military judge may be challenged for cause on grounds of "[a]ny other facts indicating that he should not sit as ... military judge in the interests of having the trial and subsequent proceedings free from substantial doubt as legality, fairness, and impartiality." For such a discretionary challenge to be granted, not only must certain facts be established but also these facts must be shown to create a substantial doubt in the mind of reasonable persons with respect to the impartiality of the trial judge. *See United States v. Kincheloe,* 14 M.J. 40, 50 (C.M.A.1982). If the challenging party does not meet these burdens, it is no abuse of discretion to deny the challenge for cause."

(Citations omitted.) *United States v. Soriano,* 20 M.J. 337, 340 (C.M.A.1985).

■ Included within this objective test is the concept of the appearance of impropriety:

> Moreover, the general mandate expressed in the Manual for dealing with challenges against the military judge is a liberal policy in favor of sustaining the challenge. We construe these provisions within the military justice system to require the military judge to *avoid the appearance,* as well as the existence, of unfairness in his court.

*United States v. Conley,* 4 M.J. 327, 329 (C.M.A.1978) (emphasis added); Canon 2, American Bar Assn, 1974, Code of Judicial Conduct. In this regard, the law appears to be well-settled. The determination of the disqualification on the basis of lack of impartiality should be made on the "basis of conduct extra-judicial in nature as distinguished from conduct within a judicial context." *Davis,* 517 F.2d at 1052; *Lazofsky v. Sommerset Bus Co., Inc.,* 389 F.Supp. 1041, 1044 (E.D.N.Y.1975); American Bar Assn., 1974, Code of Judicial Conduct, Can-

on 3C; *see United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778, 793 (1966); *Berger v. United States,* 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921).

■ As we recognized in *Smith,* "[a] recusal or disqualification motion is committed to the sound discretion of the trial judge, and the standard of review on appeal is whether the judge abused that discretion." *See* R.C.M. 902; *Gilbert v. City of Little Rock, Ark.,* 722 F.2d 1390 (8th Cir.1983), *cert. denied,* 466 U.S. 972, 104 S.Ct. 2347, 80 L.Ed.2d 820 (1984). An appellate court decides whether the judge's discretion has been abused by asking itself whether the judge's decision "cannot be defended as a rational conclusion supported by a reasonable reading of the record." *Id; United States v. Elzy,* 25 M.J. 416 (C.M.A. 1988). Addressing the remedy for a § 455 violation, should one be found, the Supreme Court has stated:

> We conclude that in determining whether a judgment should be vacated for a violation of § 455, it is appropriate to consider the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process. We must continuously bear in mind that "to perform its high function in the best way 'justice must satisfy the appearance of justice.'" *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955) (citation omitted).

*Liljeberg v. Health Services Acquisition Corporation,* 486 U.S. 847, 108 S.Ct. 2194, 2204, 100 L.Ed.2d 855 (1988).

Under the Federal statute, the party seeking disqualification submits affidavits setting forth the facts and reasons it believes supports its motion for disqualification. If the motion is timely made and a sufficient affidavit is filed alleging that the judge before whom the matter is pending has a personal bias or prejudice against him or in favor of the adverse party, the judge proceeds no further. Another judge is assigned to hear the motion for disqualification. The judge ruling on the motion

must take the facts as provided in the affidavit as true and then determine the legal sufficiency of whether the facts, taken as true, would convince a reasonable man that bias or prejudice exists. *Parrish v. Board of Commissioners of Alabama State Bar,* 524 F.2d 98 (5th Cir.1975) (*en banc*), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976); *see Berger v. United States,* 255 U.S. 22, 33, 41 S.Ct. 230, 233, 65 L.Ed. 481, 485 (1921). To meet this test, the Federal affiant must meet a three-pronged test:

1. The facts must be material and stated with particularity;

2. The facts must be such that, if true, they would convince a reasonable man that a bias exists;

3. The facts must show the bias is personal, as opposed to judicial, in nature.

*Parrish,* 524 F.2d at 100 (citing *United States v. Thompson,* 483 F.2d 527, 528 (3rd Cir.1973).

The Drafters of R.C.M. 902, however, did not adopt the Federal procedure because it was not practicable for courts-martial due to the difference in its judicial structure and the limited number of military judges. Analysis, R.C.M. 902, A21–46, MCM, U.S. 1984. Our review of the case law and the Federal statute convinces us, however, that the mechanism that was rejected by the Drafters related to the assignment of another judge to determine the disqualification motion and not to the use of affidavits. *See United States v. Grance,* 2 M.J. 846 (ACMR 1976) quoting *United States v. Howe,* 17 U.S.C.M.A. 165, 37 C.M.R. 429, 446 (1967).

 Although the Drafters of R.C.M. 902 may not have adopted the mechanism of assigning another judge to determine an alleged issue of disqualification, they did not rule out the need for the moving party to establish a reasonable factual basis as required by the Federal case law interpreting 28 U.S.C. § 455. We find, therefore, that the moving party in the military justice system also bears the burden of proving disqualification, and can do so, for example, by filing affidavits, entering into stipulations of fact or expected testimony, or calling witnesses to establish the facts and reasons in support of the party's belief that the military judge has a personal vice a judicial bias or prejudice against the party or in favor of the adverse party. The burden is the same whether the ground for disqualification falls under the mandatory and specific R.C.M. 902(b) or the discretionary and more general R.C.M. 902(a). In appellant's case, Captain Powell, Captain Donato, and Captain Swayze testified and the military judge accepted a stipulation of expected testimony of Commander Osper on the motion to dismiss on the grounds of unlawful command influence. The defense presented no evidence on its disqualification motion but asked the military judge to consider the record as it related to their discussion of the issue during the Article 39(a) session. The military judge, after being told that Captain Powell would testify on the unlawful command influence motion, deferred his ruling on the disqualification/recusal motion until after he heard that testimony. The defense then queried the military judge about whether it would be permitted to further *voir dire* the military judge after Captain Powell testified. In particular, the defense wanted the military judge to tell the defense

whether particular aspects of Captain Powell's testimony are true and will the court disclose to the defense, whether any aspects of Captain Powell's testimony are not true; and further, if Captain Powell's memory is perhaps not as good as the court's, will the court disclose those facts of which it has knowledge but which Captain Powell cannot remember.

The military judge responded: "How I will deal with the substance of his testimony, I will have to arrive at a decision with respect to that procedure after I have heard him testify." The defense then stated that R.C.M. 902 prohibited the military judge from presiding in a case in which he will be a witness. The military judge had previously stated that "the court will not permit itself to become a witness or to testify under oath concerning any of the specifics

608

of Captain Powell's telephone call to the judge." Subsequently, at the time he ruled adversely to the defense on the motion to dismiss on the grounds of unlawful command influence, the military judge made the following findings of fact on the issue of his disqualification:

Admiral Slater [the DJAG] did not influence judge selection in this case. Whether or not he attempted to do so is speculation by the defense. Captain Powell did not influence judge selection in this case. Whether or not he attempted to do so is speculation by the defense. [As] to the telephone conversation between Captain Powell and myself, the military judge. The matters addressed were administrative cost concerns. Captain Powell has denied any effort to influence the court and the military judge has not been in fact influenced and will not give undue concern to the cost of the trial to the detriment of the accused.

The defense did not repeat its request for the military judge to give it the opportunity to conduct supplementary *voir dire* of him after Captain Powell had testified. Neither did the defense call the military judge as a witness.[15] Finally, the defense made no showing at trial nor before us that would refute, or in anyway challenge, the validity of the military judge's disclaimer. The defense also failed to present any probative evidence that would support its inference that the *ex parte* conversation Captain Powell had with the military judge impacted on the military judge's decisions to continue to preside and to deny appellant's motion to dismiss. We do not find sufficient probative facts to support the allegation that the military judge used *any* knowledge of his conversation with Captain Powell in making his decision not to grant the motion for disqualification. *See King v. United States*, 576 F.2d 432 (2d Cir. 1978). In fact, reading the circumstances surrounding the particular incident as a whole, we find no facts placed in evidence that were material to the defense allegation of bias; no facts stated with particu-

larity, nor were the facts stated such that even if true would a reasonable man find that bias existed. Finally, and most significantly, no facts, as presented, show that the alleged bias was personal rather than judicial.

The military judge did not specifically rule on the motion to disqualify although we can conclude from his findings that had he ruled, he would have denied the motion. He impliedly denied the motion when he continued to sit. The defense did not renew the challenge nor did it object to his failure to rule specifically on the motion. At the stage of the proceedings where appellant had to select the composition of the court, he elected to be tried by officer members. In so electing, he did not state that he was doing so because he believed the military judge was disqualified and that due to the military judge's refusal to grant the disqualification motion or to recuse himself, appellant was forced to select trial by a court composed of members. *See United States v. Edwards*, 27 M.J. 504 (ACMR 1988); *see also United States v. Griffin*, 8 M.J. 66 (C.M.A.1979).

■ That the defense, as the challenging party, failed to sustain its burden of asserting sufficient facts to support an allegation of the lack of impartiality in the military judge, does not, as we previously noted, relieve the military judge from determining *sua sponte* whether his presiding at the appellant's court-martial might raise in the mind of a reasonable person a question as to his impartiality. "The trial judge has an obligation to recuse himself whenever necessary to protect the right of the accused and of the public to an impartial trial.... The appearance of bias or prejudice can be as damaging to public confidence as would be the actual presence of bias or prejudice...." *United States v. Bradley*, 7 M.J. 332, 333–334 (C.M.A.1979) quoting Commentary, ABA Standards, *The Function of the Trial Judge*, § 1.17 (1972). *See United States v. Head*, 2 M.J. 131 (ACMR 1977). Previously, the Court of

**15.** Although the military judge apparently indicated he would not submit to being called as a witness, counsel must often make futile requests in order to preserve the issue they have otherwise raised. *See* Mil.R.Evid. 103(a).

Military Appeals construed R.C.M. 902(a)'s predecessor provision, paragraph 62 f, MCM, 1969 (Rev.), "within the context of the military justice system to require the military judge to avoid the appearance, as well as the existence, of unfairness in his court." *Conley*, 4 M.J. at 329. The Court interpreted the general mandate of the provision to be a "liberal policy in favor of sustaining the challenge." *Id.*

Using the objective standard, the military judge must look at all of the circumstances surrounding the case. This includes the evidence submitted by the appellant on his motion to dismiss on the ground of unlawful command influence, particularly as it reflected the events surrounding his being detailed to preside at appellant's court-martial—or the appearance thereof— to determine what a reasonable man might believe. It is at this point that a finding of the existence or non-existence of apparent unlawful command influence overlaps with the appearance of impartiality of the judge for disqualification under R.C.M. 902(a) purposes. In appellant's case, even presuming that the military judge was aware of the fact that some of his superiors considered him a "lenient sentencer" and presuming further that he believed his superiors had attempted to prevent him from sitting in appellant's case because of their concern for his "defense orientation", we, like the First Circuit Court of Appeals, find

> it is beyond contemplation that such [knowledge] would be of the weight necessary to cause a judge to jettison his impartiality and, in open court day after day, to violate his deepest professional and ethical commitments as a judge.

*In re United States*, 666 F.2d at 696; *United States v. Montgomery*, 16 M.J. 516 (ACMR 1983).

The Court of Military Appeals has rejected the view that appellate courts are bound by the disclaimers of individuals that they would not be influenced by improper conduct because although "we entertain no doubt of the complete sincerity of the officers concerned, we also recognize that jurors are human and not always conscious to what extent they are in fact biased or prejudiced and their inward sentiments can not always be ascertained. Members and military judges must be mentally free to make impartial findings and to adjudge an impartial sentence based upon the law and the evidence before them." *Zagar*, 18 C.M.R. at 38.

It must be noted, however, that judges are different than court members. Whether the military judge is mentally free is determined by giving considerable weight to his disclaimer of bias or prejudgment, and his oath to faithfully and impartially perform his duties. *United States v. Jarvis*, 22 U.S.C.M.A. 260, 46 C.M.R. 260 (1973). "Because of his professional training and experience, a military judge is presumed to be capable of ignoring irrelevant matters and to base his judicial determinations solely on competent evidence properly admitted." *United States v. Montgomery*, 20 U.S.C.M.A. 35, 42 C.M.R. 227 (1970); *United States v. Reed*, 2 M.J. 972, 977 (ACMR 1976).

Even if the military judge abused his discretion in failing to recuse himself because a reasonable man, considering all of the facts as true, would believe the judge lacked impartiality, the military judge could, under certain circumstances, (*e.g.*, an accused's continued desire to be tried by judge alone) continue to preside. *See United States v. Edwards*, 27 M.J. 504 (ACMR 1988).

Finally, R.C.M. 902(e) permits waiver of R.C.M. 902(a) disqualification by the parties after full disclosure; waiver is prohibited for any R.C.M. 902(b) disqualification. In light of the full adversarial hearing on the appellant's motions to dismiss due to unlawful command influence and disqualification of the military judge, we believe full disclosure of the disqualification was made.

██ Accordingly, we find that the military judge was not disqualified under any of the provisions of R.C.M. 902(b). While he may have abused his discretion in failing to *sua sponte* recuse himself based upon R.C.M. 902(a), the disqualification was waived by appellant when he failed to challenge the military judge, object to his failure to recuse, or preserve any objection at

the time he selected trial by a court composed of members. *See United States v. Edwards,* 27 M.J. 504 (ACMR 1988); *United States v. Montgomery,* 16 M.J. 516, 518 (ACMR 1983); *see also United States v. Griffin,* 8 M.J. 66, 68 (C.M.A.1979). As a result, we find that the military judge's decision not to recuse himself and to deny appellant's motion for disqualification can be defended as a rational conclusion supported by a reasonable reading of the record.

## III. PRODUCTION OF WITNESSES

First, we will summarize the applicable law as it pertains to our resolution of the military judge's denial of the defense requests for the production of witnesses on the motions, particularly the motion to dismiss for unlawful command influence, and on the merits. We will then separately apply the law to the facts of the case as they relate to the witnesses on the motions and on the merits.

### A. *The Law*

■ An accused has the right to compel the attendance of witnesses at trial. Article 46, UCMJ, 10 U.S.C. § 846; RCM 703(a), MCM, 1984; *United States v. Carpenter,* 1 M.J. 384 (C.M.A.1976); *United States v. Jones,* 20 M.J. 919, 925 (NMCMR 1985). This statutory right is based upon an accused's sixth amendment right to compulsory process and the related fifth amendment right not to be denied that right because of his inability to pay for the witnesses' presence. *United States v. Williams,* 3 M.J. 239, 242 (C.M.A.1977). The right to compel the attendance of witnesses, however, is not absolute; the defense must demonstrate that witnesses are both material and necessary before any order to produce is required. *United States v. Tangpuz,* 5 M.J. 426 (C.M.A. 1978); *Williams,* 3 M.J. at 239. Materiality has been defined by the Court of Military Appeals as embracing the " 'reasonable likelihood' that the evidence could have affected the judgment of the military judge or court members." *United States v. Hampton,* 7 M.J. 284, 285 (C.M.A.1979)

*citing Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). A witness is material when he either negates the government's evidence or supports the defense. *United States v. Roberts,* 10 M.J. 308, 313 (C.M.A.1981); *United States v. Iturralde–Aponte,* 1 M.J. 196 (C.M.A.1975); *Jones,* 20 M.J. at 925.

■ The defense must bear its burden of establishing the materiality and necessity of its requested witness by a preponderance of the evidence standard. R.C.M. 905(c). Once that burden is met, the witness must be produced unless the averments of the defense are "inherently incredible on their face, or unless the Government shows, either by introducing evidence or from other matters already of record, that the averments are untrue or that the request is otherwise frivolous." *United States v. Sweeney,* 14 U.S.C.M.A. 599, 603, 34 C.M.R. 379, 383 (1964) quoting *Greenwell v. United States,* 317 F.2d 108, 110 (D.C.Cir.1963), *pet. for reh'g en banc denied.*

■ Whether the defense is entitled to the personal attendance of a material witness is a matter within the discretion of the military judge. *Tangpuz,* 5 M.J. at 429. We agree with the Government that the current state of the law requires a military judge, in exercising his discretion, to balance at least seven factors in determining whether a material witness must be produced: (1) the issues involved in the case and the importance of the requested witness to those issues; (2) whether the witness was desired on the merits or on sentencing; [16] (3) whether the witness' testimony would be "merely cumulative;" (4) the availability of alternatives to the personal appearance of the witness such as depositions, interrogatories, or previous testimony; (5) the unavailability of the witness, such as that occasioned by nonamenability to the court's process; (6) whether or not the requested witness is in the armed forces and/or subject to military orders; (7) the effect that a military witness' absence will have on his or her unit and

16. R.C.M. 703(b)(1) authorizes production of witnesses on interlocutory questions.

whether that absence will adversely affect the accomplishment of an important military mission or cause manifest injury to the service. *United States v. Tangpuz*, 5 M.J. 426, 429 (C.M.A.1978); *United States v. Bennett*, 12 M.J. 463 (C.M.A.1982); *United States v. Davis*, 19 U.S.C.M.A. 217, 41 C.M.R. 217 (1970); *United States v. Manos*, 17 U.S.C.M.A. 10, 37 C.M.R. 274 (1967); *United States v. Ciarlatta*, 7 U.S. C.M.A. 606, 23 C.M.R. 70 (1954); *United States v. Jones*, 20 M.J. 919 (NMCMR 1985). But, considerations other than materiality have no role in determining whether the Government must produce the requested witness. *United States v. Carpenter*, 1 M.J. 384 (C.M.A.1976). For example, inconvenience, cost, or distance of the witness from the place of trial are not considerations for the Government to escape its responsibility for providing a witness. *United States v. Willis*, 3 M.J. 94, 96 (C.M.A.1977); *Jones*, 20 M.J. at 931–932. The decision whether a material witness must be ordered produced by a military judge, therefore, must be analyzed on a case-by-case basis with the military judge weighing "the materiality of the *testimony* sought against the equities of the situation." *Jones*, 20 M.J. at 925 (emphasis added); *United States v. Ambalada*, 1 M.J. 1132 (NCMR 1977), *pet. denied*, 3 M.J. 164 (C.M.A.1977).

■ This right to compel the attendance of material witnesses, therefore, is not absolute. The accused has no right to compel the attendance of witnesses whose testimony would be merely cumulative with testimony already available to the defense. The military judge, exercising sound discretion, determines whether a material witness' testimony will be cumulative. *Williams*, 3 M.J. at 243; *United States v. Scott*, 3 M.J. 1111 (NCMR 1977), *rev'd in part on other grounds*, 5 M.J. 431 (C.M.A. 1978); *United States v. Romano*, 482 F.2d 1183, 1195 (5th Cir.1973). Credibility of the witness is an important factor that must be considered by the military judge in determining whether the witness' testimony is cumulative. *Jones*, 20 M.J. at 919. A military judge must permit the parties to develop the facts on an issue so that he can

make an informed and knowledgeable decision when exercising his discretion in deciding the issue in question, *see United States v. Fisher*, 24 M.J. 358, 362 (C.M.A.1987); credibility can very well be determinative.

■ For a military judge to determine whether the material witnesses are "merely cumulative," he must resolve at least three questions: (1) Is the credibility and demeanor of the requested witness greater than that of the attending witness? (2) Is the testimony of the requested witness relevant to the accused with respect to character traits or other material evidence observed during periods of time different than that of attending witnesses? (3) Will any benefit accrue to the accused from an additional witness saying the same thing that other witnesses have already said? *United States v. Jouan*, 3 M.J. 136 (C.M.A. 1977); *United States v. Williams*, 3 M.J. 239 (C.M.A.1977); *United States v. Scott*, 3 M.J. 1111 (NMCMR 1977), *rev'd in part on other grounds*, 5 M.J. 431 (C.M.A.1978); *United States v. Jones*, 20 M.J. 919, 927 (NMCMR 1985). A military judge must be careful, however, not to confuse cumulativeness with corroboration—the latter having the potential for "important impact" on the factfinder at trial. Corroboration witnesses must be produced if unfairness in the court-martial process would result from their absence. *Williams*, 3 M.J. 239, 243 n. 8 (C.M.A.1977). Finally, if the military judge finds that the testimony of various witnesses is cumulative and states how many he will permit to testify in person, "only the defense may properly decide *which* of these witnesses will be utilized. To permit otherwise would be to tolerate someone other than the defense counsel making this legitimate and essential defense tactical decision." *Williams*, 3 M.J. at 243 n. 9. The fact that a military judge finds the witness' testimony material but denies production does not mean that the witness' testimony is lost to the defense. Quite the contrary.

The Court of Military Appeals held in *United States v. Scott*, 5 M.J. 431, 432 (C.M.A.1978), that although materiality of the requested witness had been shown and

**612**

"although live testimony ... is normally imperative to the fairness of the process, occasionally some alternative form of testimony will pass muster under the facts and circumstances of a given case." Additionally, the Court determined that it is within the discretion of the military judge to determine the mode of evidence production so long as in exercising his discretion he ensures that the mode of production does not diminish the fairness of the court-martial process. This Court held in *United States v. Jones*, 20 M.J. 919, 931 (NMCMR 1985):

A stipulation is acceptable as an alternative to live testimony where it accedes to a simple and uncontroverted issue of fact (e.g., the opinion of a witness regarding an accused's character for honesty or the witness's knowledge of an accused's reputation for the same, or a witness's opinion that an accused was a hard worker while under his supervision). Where, however, a prospective witness's testimony goes to the very core of what is at issue in the case and may potentially, during cross and/or re-direct examination, shed light on factual discrepancies and which may assist the trier of fact in resolving the ultimate issue of guilt or innocence, it is *not* an acceptable alternative.

But, how can these holdings be reconciled with the holdings in *United States v. Thornton*, 8 U.S.C.M.A. 446, 449, 24 C.M.R. 256, 259 (1957) and *United States v. Sweeney*, 14 U.S.C.M.A. 599, 603, 34 C.M.R. 279, 383 (1964), wherein the Court of Military Appeals stated:

An accused cannot be forced to present the testimony of a material witness on his behalf by way of stipulation or deposition. On the contrary, he is entitled to have witnesses testify directly from the witness stand in the courtroom.

First, it is the *testimony*, not the actual presence of the witness, that is the key. In *Scott* the Court defined testimony "as verbal evidence, subject to the criteria of credibility, and tested by the same rules and manner as any other evidence." *Scott*, 5 M.J. at 432. Second, this Court has held that a military judge must read *Scott* narrowly. *Jones*, 20 M.J. at 931. In *Jones* we

reemphasized the *Williams* caution that a military judge must be scrupulous in assuring that the effects of the form of the testimony under the particular facts and circumstances will not diminish the fairness of the court-martial proceedings. *Scott*, 5 M.J. at 432. *Jones* also advised that a "stipulation of expected testimony is the least desirable alternate form of presenting testimony" and is acceptable only where it accedes to a simple and uncontroverted issue of fact. *Jones*, 20 M.J. at 931. Additionally, the Court of Military Appeals has admonished military judges to keep in mind "the preference for live testimony." *United States v. Cokeley*, 22 M.J. 225, 229 (C.M.A.1986). In *Cokeley* the Court set forth factors to be considered to include "the importance of the testimony, the amount of delay necessary to obtain the in-court testimony, the trustworthiness of the alternatives to live testimony, the nature and scope of earlier cross-examination, the prompt administration of justice and any special circumstances for or against delay." *Id.*

Finally, our reading of the precedent discussing the acceptability of alternatives to live testimony of a material witness reveals that alternatives have only been considered in two circumstances: (1) the material witness has been found by the military judge to be *unavailable* after considering and weighing, at least, the seven *Tangpuz* factors; and (2) the material witness' testimony has been found by the military judge to be *cumulative* after considering and weighing at least the *Jouan–Williams* factors. Unless one of those two situations exist, the defense is entitled to the production of the material witness for live testimony.

If a military judge errs in denying the presence of a material witness to give live testimony, even then, an improper denial "is not an automatic ground for reversal of an otherwise valid conviction." *Jones*, 20 M.J. at 932; quoting *United States v. Qualls*, 9 M.J. 662 (NCMR 1980). Reversal of an accused's conviction is required only when the military judge's abuse of his dis-

cretion resulted in a fair risk of prejudice to the appellant. *United States v. Lucas*, 5 M.J. 167 (C.M.A.1978); *United States v. Qualls*, 9 M.J. 662, 665 (NMCMR 1980). Prejudice is determined by whether it can be said beyond a reasonable doubt that presentation of the live testimony of the absent witness, on the key issue of credibility, would not have tipped the balance in favor of the accused. *Lucas*, 5 M.J. at 167, *United States v. Ambalada*, 1 M.J. at 1121; *Jones*, 20 M.J. at 919.

We now apply the applicable facts to this law to determine the validity of the military judge's rulings denying the defense motions to produce witnesses on the motion to dismiss on the grounds of unlawful command influence and to produce witnesses material to its motion to suppress and defense on the merits.

B. *Witnesses on the Motion to Dismiss*

At trial the defense requested that several witnesses be produced to testify on its motion to dismiss the charges on grounds of unlawful command influence. The military judge denied their requests. The witnesses who were allegedly wrongly denied are Former Secretary of the Navy John Lehman, then-Secretary of the Navy James Webb, Lieutenant Colonel Powell, and Captain Byrne.

 As to the military judge's ruling denying the request for Former Secretary Lehman and then Secretary Webb, we hold that the military judge did not abuse his discretion in denying their production because the defense did not bear its burden of showing the necessity and materiality of their testimony and, most significantly, they did not comply with the requirements of R.C.M. 703. *See United States v. Tangpuz*, 5 M.J. 426, 428 (C.M.A.1978); *see generally Lucas*, 5 M.J. at 167. The fact that it was defense strategy not to meet the R.C.M. 703 requirements or not to place its position on the record because it would have been a fruitless gesture,[17] is "not the

business of this court absent the discovery of prejudicial error." *See United States v. Czapla*, 21 M.J. 919, 923 (ACMR 1986). We find no prejudicial error. We also find the military judge did not abuse his discretion in denying the production of Lieutenant Colonel Powell because his testimony would have been inadmissible hearsay under Mil.R.Evid. 802.

We will discuss in more detail, however, the military judge's ruling denying the defense request for Captain Byrne who was the Chief Judge of the Navy–Marine Corps Trial Judiciary. The issue for which Captain Byrne was allegedly material to appellant's case was unlawful command influence. That such an issue is of critical importance to the court-martial process in general and the accused in particular goes almost without saying because unlawful command influence poses "a special threat to military due process of law by introducing into judicial proceedings powerful external factors which can skew results." *United States v. Cruz*, 20 M.J. 873, 879 (ACMR 1985); *United States v. Thomas*, 22 M.J. 388 (C.M.A.1986). Not only do the military courts treat such an issue as a matter of serious concern, the issue is shown "special solicitude." *United States v. Blaylock*, 15 M.J. 190, 193 (C.M.A.1983).

As we have previously related, the accused bears the burden of raising the issue of the existence of unlawful command influence and he is required to produce more than a mere allegation of unlawful command influence to succeed. *Cruz*, 20 M.J. at 885 (cases cited therein at note 10). The Government must rebut the defense's evidence by clear and positive evidence. *Compare United States v. Treakle*, 18 M.J. 646 (ACMR 1984) (*en banc*) with *United States v. Rosser*, 6 M.J. 267 (C.M.A.1979) and *United States v. Adamiak*, 4 U.S.C. M.A. 412, 15 C.M.R. 412 (1954). If the Government fails to rebut the defense evidence demonstrating the existence of unlawful command influence, the presump-

---

**17.** Appellant explained during oral argument before us that he had not requested the trial court to order subpoenas for the requested witnesses on the motion because the military judge, during an 802 conference, indicated that he would

deny the request. "Normally, of course, a denial of subpoenas or a request to take depositions must be renewed at trial in order to preserve the issue on appeal." *United States v. Manos*, 17 U.S.C.M.A. 10, 15, 37 C.M.R. 274, 279 (1967).

tion exists that the accused was denied a fair trial and it becomes incumbent upon the Government to bear the heavy burden of proving that the results of the accused's trial were not affected by the unlawful command influence. *Thomas*, 22 M.J. at 396.[18]

At trial the appellant asserted his need for the personal appearance of Captain Byrne as follows:

> Now, Judge Byrne, I assume, will testify that [Admiral Slater's call to him relating his concern that Judge Reed was a light sentencer] did not influence him.

The Court of Military Appeals has often spoken about questioning people with regard to such denials, and that such denials should not be accepted at face value. The defense urged at trial: "[w]e have cited that testimony and cited those cases in our moving papers, .that we need to bring Judge Byrne to testify on this as a factual matter and judge his credibility," and that Captain Byrne's testimony was required so that the defense could "lay a factual predicate for the influence by Rear Admiral Slater and Captain Powell" and to cross-examine him on "his assertion that he was not influenced." Defense also claimed that Captain Byrne's testimony and that of Captain Donato would conflict as it related to the classification status of the national security information involved in appellant's case and inferentially that such conflict impacted upon the validity of Captain Byrne's rationale for the assignment of only Captain Roberts to appellant's case because a special judge with SCI clearance was necessary to preside. The Government argued that Captain Byrne's presence was not necessary because his responses to the defense interrogatories were sufficient evidence on the matter. Trial counsel offered to stipulate that a telephone call to Captain Byrne did come from Rear Admiral Slater and that the content of the conversation was substantially that as related by the defense. The trial counsel refused, however, to stipulate that Captain Byrne

was influenced by the call. The military judge denied the defense request to produce Captain Byrne based on the following:

> [w]hile his physical presence would undoubtedly be helpful in determining to what extent the communication initiated by Captain Powell and passed through Admiral Slater may have influenced his decision to initially detail Captain Roberts as Military Judge in this case, the fact remains that I am the Military Judge who would have been detailed in due course. And the only decision that Captain Roberts made that affected the rights of the accused was the continuation in pretrial confinement issue, which can be relitigated and as I understand it is a subject of motion.... And furthermore with respect to any other issues that could be resolved by Captain Byrne's testimony, it appears clear that those issues can be resolved through stipulation to the detailed and the extensive interrogatories that have been answered by Captain Byrne.

The military judge also ruled that Captain Byrne's testimony could be admitted by stipulation of the parties to the interrogatories. The defense agreed, over its objection, to stipulate to Captain Byrne's answers to the interrogatories. The military judge, however, did permit the defense to argue the spoliatory inference that Captain Byrne *had* been influenced by Rear Admiral Slater. On the other hand, the military judge, in his ruling on the issue of command influence stated: "[I]n this case, to make the leaps from the appearance of unlawful command influence to actual unlawful command influence, would require disbelieving the responses, that is the sworn responses, of Captain Byrne to written interrogatories."

One of the central issues of the unlawful command influence motion at trial was whether Captain Byrne was in fact influenced by the Deputy Judge Advocate General's telephone call. Appellant argues that there were factual discrepancies in Captain Byrne's responses to the interroga-

---

18. *Thomas*, 22 M.J. at 388, describes at least four ways in which the Government might bear its burden.

tories such that a "forced" stipulation was not an acceptable alternative to Captain Byrne's live testimony.

Appellant cites this Court's decision in *Jones*, 20 M.J. at 919, in support of its contention that the military judge abused his discretion in making the above-quoted ruling. Appellant contends that the responses to the interrogatories did not deal with simple and uncontroverted facts and that he was denied his right to cross-examine the credibility of Captain Byrne as to the lack of impact on him of the Powell–Slater call and his detailing of the military judges to appellant's case. Based upon our review of the record, we find that the military judge did not articulate the factors he weighed in arriving at his decision to deny the motion, R.C.M. 905(d), MCM; *see United States v. Postle*, 20 M.J. 632 (NMCMR 1985). The record does reflect, however, the standard he used in denying the defense's motion, *i.e.*, assuming the defense is correct, the accused has not been prejudiced because he got the same judge he would have gotten had there been no phone call or Special Judge Program. Such standard was incorrect.

 First, applying the seven factors the military judge should have considered in determining whether Captain Byrne should have been produced, the facts of record reveal and we find (1) the issue of unlawful command influence was a significant issue and Chief Judge Byrne was an important witness on the issue in that his testimony went to the "very core" of the unlawful command influence issue as it related to the detailing of Captain Roberts and then Captain Reed as the military judges in appellant's case; (2) although Chief Judge Byrne was not desired as a witness on the merits or on sentencing, he was desired on a critical interlocutory matter; (3) Captain Byrne's testimony would have been somewhat cumulative to Captain Donato's and Captain Powell's but not entirely so, because he would have related facts of his own personal knowledge, facts which Captain Donato and Captain Powell could only have had second-hand knowledge; (4) Captain Byrne's live testimony

would have assisted the parties and the military judge in resolving any issue of credibility; (5) interrogatories were available and admitted by stipulation on the motion; (6) and (7) Captain Byrne was subject to military orders and thus not unamenable to the court's process; and (8) no evidence supports any finding that Captain Byrne's absence from his office would have in any way adversely affected the accomplishment of the judiciary's mission or caused manifest injury to the service. From these findings we conclude that Captain Byrne's testimony was material, necessary, and available. This conclusion is not at odds with the implicit findings of the military judge. We note here that just as "testimony on the merits differs widely from that offered in extenuation and mitigation," *Sweeney*, 34 C.M.R. at 386, we believe testimony on a motion involving unlawful command influence differs significantly from that offered on other motions. Due to the "grave concern" with which the courts treat the unlawful command influence issue, we hold that witness testimony on such a motion must be treated as critically as testimony on the merits. *Cf. United States v. Mabe*, 28 M.J. 326 (C.M.A. 1989). In short, the defense bore its burden by a preponderance of the evidence. Captain Byrne was material and necessary to the defense's motion to dismiss on grounds of unlawful command influence, and, absent evidence to the contrary—of which the record reflects none—he was available and his testimony would not have been cumulative.

We must now determine whether the military judge abused his discretion in denying the production of Captain Byrne to give live testimony. *United States v. Cokeley*, 22 M.J. at 225; *Tangpuz*, 5 M.J. at 426. In other words, was the alternative mode authorized by the military judge adequate? We interpret the military judge's ruling to mean that he found no "reasonable likelihood" that the live testimony of Captain Byrne would in any way affect his decision on the issue, *Hampton*, 7 M.J. at 285, that he was convinced the evidence before him demonstrated beyond a reasonable doubt that the *live* testimony of Captain Byrne

would not tip the balance in favor of the accused, the evidence being so strong as to show no reasonable possibility of prejudice to the accused. *Lucas*, 5 M.J. at 172–173. We find his analysis flawed because he used the wrong standard. His responsibility was not to forecast any resulting prejudice if the witness was not produced but to determine materiality and necessity, to include cumulativeness, and availability based upon all the evidence before him. He then was to rule on the motion to dismiss due to unlawful command influence based upon all the evidence before him, including the live testimony of all material and available witnesses. *See United States v. Carpenter*, 1 M.J. 384 (C.M.A. 1976). What the military judge apparently did in using an erroneous standard—or by lumping the two issues into one—when he denied the appellant's right to the testimony by personal appearance of Captain Byrne is analogous to what our court found the convening authority did in *Jones*, *i.e.*, "obviate the necessity of ever having to have live witness testimony at all." *Jones*, 20 M.J. at 932. And, as we stated in *Jones*, "[s]uch a niggardly approach to an accused's right to compulsory process cannot be tolerated and emasculates the type of trial envisioned by the framers of the UCMJ." *Id.*

The key issue surrounding the production of Captain Byrne was credibility, particularly as it related to the reason for the creation of the Special Judge Program, the detailing of Captain Roberts and his removal, and the detailing of Captain Reed with its concomitant effect on Captain Reed's future ability to be impartial. It could be reasonably argued that the military judge remedied the problem by allowing the defense to argue the inference that Captain Byrne *had been influenced* by Admiral Slater's call and as a result of that influence Captain Byrne saw to the enactment

of the Special Judge Program and detailed Captain Roberts instead of Captain Reed because the latter was a lenient sentencer. But, this argument is also flawed. Allowing the defense to argue the inference was mere academics and became a neutral factor in light of the military judge's determination that to accept that inference he would have to disbelieve the responses given in the interrogatories, something he was not inclined to do. That was the core of the whole issue—the credibility of the responses to the interrogatories. Although it is fact, as the military judge found, that he, over whom all of the controversy occurred, actually became the military judge in appellant's case, he was not the same judge. Even assuming that Captain Byrne had testified and that the military judge had found Captain Byrne not to have been influenced by the Slater call, the military judge was still not the same military judge over whom the parties were arguing. He was tainted to the extent that his impartiality was placed into question as a result of his being the target of improper influence. At the time he was presiding, Captain Reed was a military judge who was aware that he was considered a lenient sentencer who displeased some senior judge advocates. He also was aware that the displeasure was such that it caused a call from the staff judge advocate of the convening authority of appellant's court-martial to the Deputy Judge Advocate General of the Navy who in turn called the Chief Judge of the Trial Judiciary.[19] The military judge also was aware that the displeasure of some senior judge advocates over sentencing had been conveyed to the Judge Advocate General, himself, at the Pacific legal conference. He was also aware, however, that the Judge Advocate General told the senior judge advocates concerned that sentencing was totally within the discretion of the military judge and he would not inter-

---

**19.** We take judicial notice of the fact that the performance evaluation of Captain Reed would have been written by Captain Donato, the Circuit Military Judge; that neither the Chief Judge nor the Deputy Judge Advocate General of the

Navy would have had any official or routine input for his performance evaluation. That, of course, does not negate any influence the Chief Judge or the Deputy Judge Advocate General

fere.[20]

Further, we believe that the integrity of a military judge must be presumed absent a showing to the contrary. Implicit in the military judge's ruling denying the personal appearance of Captain Byrne was the fact that Captain Reed found that he could continue to sit on the accused's case in the same frame of mind as he would have sat had the events leading to the alleged unlawful command influence never occurred. We find nothing to indicate he abused his discretion in making that finding.[21]

Accordingly, we find: (1) that Captain Byrne should have been produced as a witness because he was material to the issue at hand; (2) that Captain Byrne's testimony was not cumulative and he was not unavailable; (3) that credibility was the core of the unlawful command influence issue as it related to the impact of the Powell–Slater–Byrne calls and subsequent events surrounding the Chief Judge's detailing of the military judge to appellant's case; (4) that the military judge abused his discretion in ordering the defense to stipulate to Captain Byrne's responses to the interrogatories rather than order his personal appearance in order to allow the defense to challenge the credibility of his responses in relation to themselves and other evidence of record; and, (5) that the military judge used the wrong standard when he denied the appellant's request; but, (6) that the stipulation of Captain Byrne's responses to the interrogatories was adequate to allow the defense to bear its burden of producing sufficient evidence to raise the issue of unlawful command influence and overcome the presumption of regularity. Despite these individual findings and despite the fact that we find the military judge abused his discretion in denying the production of Captain Byrne, under the totality of circumstances,[22] we are convinced beyond a reasonable doubt that presentation of Captain Byrne's testimony by his personal appearance would not have tipped the balance in favor of the accused: the military judge would not have ruled in favor of the accused. Thus, the military judge did not err to the prejudice of the appellant when he denied the appellant's motion to dismiss.[23]

would have on Captain Reed's continuation as a military judge or his next regular assignment.

**20.** We also find that a possibility exists that had Captain Byrne testified and had the military judge concluded that Captain Byrne had been influenced, the defense might have had grounds to challenge the military judge for cause or request his recusal on the basis of unlawful command influence. This latter concern, however, can be removed as an issue since the impact of the Powell–Slater–Byrne communications would have been the same on Captain Reed regardless of any finding of actual influence on Captain Byrne. Captain Reed was still aware that he had apparently incurred the displeasure of some senior judge advocates. Furthermore, despite Captain Byrne's absence, the defense still had sufficient evidence to that effect available at the time of trial to support a challenge for cause or request for recusal. They did, in fact, challenge the military judge for cause, but the challenge was based upon his being a witness in the case and not because he had been subjected to unlawful command influence, apparent or actual. Thus, we find that the defense waived any issue of the military judge's disqualification on grounds of unlawful command influence.

**21.** Here, we reiterate the fact that a military judge is different from court members in that he is presumed to know the law and will dis-

regard any matters not properly before him. *United States v. Montgomery,* 10 U.S.C.M.A. 35, 42 C.M.R. 227 (1970); *United States v. Eck,* 10 M.J. 501 (AFCMR 1980), *pet. denied,* 10 M.J. 289 (C.M.A.1980); *United States v. Walker,* No. 89–0638 (NMCMR 28 December 1989).

**22.** The totality of circumstances includes the assumption that Captain Byrne's testimony would have persuaded the military judge that Captain Byrne had been unlawfully influenced to the extent that his decisions regarding the detailing of military judges in appellant's case were made as a result of that unlawful influence. The military judge made it perfectly clear that he believed he would have been the detailed judge in the end and that he would impartially perform his judicial duties.

**23.** *See* Discussion, II. Disqualification/Recusal, *infra.* We have used the beyond a reasonable doubt standard in determining the prejudice to the appellant of denial of a witness motion because the witness is material to the issue of unlawful command influence, the ultimate determination of which we must be convinced beyond a reasonable doubt. *Cf. United States v. Thomas,* with *United States v. Lucas,* and *United States v. Rhodes,* 14 M.J. 919 (AFCMR 1982).

## C. *Witnesses on the Motions to Suppress and on the Merits*

■ Appellant claims that he was prejudiced because the military judge denied his request to produce Julie A. Meru, Special Agent McBride, and Special Agent Orme. Julie Meru was the common law wife of appellant. They had lived together for seven years in a house she owned. The defense asserted at trial that Julie A. Meru was a material witness for the defense both on the motion to suppress appellant's statements to Special Agent Smith for failure to give *Miranda* warnings after suspicion had focused on appellant and the motion to suppress all evidence gathered from her house because of the illegality of the search. Specifically, she could testify as to the friendship between appellant and Special Agent Smith, the NIS agent who obtained appellant's confession, and to the participation, or lack thereof, of Philippine law enforcement authorities during the search of her house that produced evidence the Government was going to try and use against appellant. The defense also claimed that she was a material witness for the defense on the merits because she could testify that she never saw appellant participate in any espionage activity; and, she never saw him pass any documents to Sgt. Tungol or Sgt. Lapay of the Philippine Constabulary. The Government countered that Meru's testimony was irrelevant and would be cumulative to the testimony available through the Government's witnesses, the NIS agents.[24] On review, appellate Government contends that she was not a sufficiently material witness to justify bringing her from the Philippines to the United States and the failure of the military judge to do so was not only void of discretionary abuse, "but it was the natural result of the sort of balancing of the equities that is required by current case law." *Jones*, 20 M.J. at 925. The Government's statement that Meru was not "sufficiently material" seems to concede that her testimony had at least some materiality—we find no degrees of materiality. If a witness is material, that ends the question and

the Government must produce that witness unless the testimony is cumulative or the witness is unavailable. On the other hand, the Government also argues that Meru's testimony that she knew nothing of appellant's espionage activities did not "rise to the level to require her personal appearance" and as a result the military judge considered that in weighing the *Tangpuz* factor of "the importance of the requested witness to the issues involved in the case." *Jones*, 20 M.J. at 931. We agree. We also agree that her testimony was irrelevant since the fruits (appellant's brief case containing classified and unclassified defense information) of the search of her house belied any benefit the appellant would accrue by her testifying about her lack of knowledge as to his espionage activities. Her testimony would neither negate the Government's evidence nor support the defense. She was not material. Accordingly, the military judge did not abuse his discretion in denying Julie Meru's personal appearance.

Special Agent McBride was the Special Agent in Charge, NIS, Subic Bay, Philippines. Appellant contended at trial that he was material to the defense's case on the merits because his testimony was critical to the defense's position on the question of harm to the United States or advantage to a foreign government, one of the essential elements of the espionage offense with which appellant was charged. Defense counsel also contended that he was critical to the question of scienter and bad faith as those concepts related to the element of harm to the United States or advantage to a foreign government.

Special Agent Orme was the NIS Regional Director for Operations for Southeast Asia, Subic Bay, Philippines. Special Agent Orme was material, according to the defense, because he would testify that NIS frequently shared intelligence with Philippine officials, including Colonel Aguilar; that NIS had not suffered as a result of appellant's alleged activities or conduct; that he would have provided a current hit

---

**24.** We caution the Government about its interpretation of cumulativeness, particularly as defense witness testimony is cumulative of Government witness testimony. *See Williams.*

list of targets requested of Allen (the subject of the solicitation offense alleged in Charge III, Specification 1) as well as an assessment of its accuracy had he been asked; that after some initial hard feelings of some Philippine officials over concerns that the United States believed the Philippines were spying on the United States, normal relations resumed.

As to Special Agent Orme, since he did, in fact, testify for the defense, the assigned error for failure to produce him is moot. As to Special Agent McBride, the military judge determined that his testimony would be cumulative with that of Special Agent Orme so he denied the motion. We will discuss this denial of McBride in more detail. In announcing his decision denying Special Agent McBride and his choice of Special Agent Orme, the military judge explained:

> I picked Orme in utmost candor here, I picked Orme in your behalf because it appeared that he was the better of the two witnesses based on the synopsis of testimony, and in my consideration I weighed heavily the testimony of Special Agent—I believe it was Daniels who indicated the impact on the office out there. And it strikes me in balancing the needs here that through Special Agent Orme the defense can present the evidence you sought through both Orme and McBride with sufficient force and effect to meet their needs and could not in any way prejudice Senior Chief Allen.

The prosecution had also called Special Agent Daniels who testified on the motion for production that Special Agents McBride and Orme were "key decision and policy makers for NIS in Southeast Asia" and their loss for any extensive period of time would have a "severe impact" on the ability of NIS to carry out its mission. From the record it does appear, as contended by the Government, that the defense wanted Special Agents McBride and Orme to testify about the nature of documents that are routinely released by NIS officials to the Philippine Government. Orme so testified. Orme's credibility was never in question. As we understand the facts from the record, Special Agent Orme was a regional

director for NIS operations for Southeast Asia and, we presume, senior to, or at least more knowledgeable than, Special Agent McBride—who was Special Agent in Charge of the Subic Bay NIS office—as to the release of classified matter to the Philippine Government. Additionally, the record reflects that Special Agent Orme's testimony on the subject was extensive. Appellant fails to identify any specific noncumulative benefit of which he was deprived by the military judge's denial of the production of Special Agent McBride. Nor do we find that the cumulativeness in this case should have been in any way considered corroboration. Also, appellant does not allege such on review nor did he address that issue to the military judge at the time he was advocating Special Agent McBride's production.

 The Government called Special Agent Daniel to justify the failure of Special Agents McBride and Orme's appearance on the basis of the severe impact their absence would have on the NIS mission in the Philippines. The military judge used such evidence in weighing his decision whether to order the agents produced. Our review of the evidence, in light of the defense's offer to accept accountability for short continuances to remedy the alleged impact issue, leads us to reject that part of the military judge's ruling and to find an abuse of discretion. We do not find sufficient evidence of record to support a finding that such a short absence that did not overlap with the absence of Special Agent Orme would have created a severe impact on the NIS mission. But, because we do find that the military judge ruled that Special Agent McBride's testimony was cumulative to Special Agent Orme's and we concur with that ruling, the availability issue is rendered moot. Ordinarily, we could therefore find no error. Because the military judge found the testimony of the two witnesses cumulative, however, he should have informed the defense that they were limited to one witness and then offered it the choice of Special Agent McBride or Special Agent Orme. *Williams*, 3 M.J. at 242. Instead, he made the choice the de-

fense was entitled to make. Accordingly, we find the decision made by the military judge and the procedure he followed because of that decision constitute legal error; but, under the circumstances of this case, absent a specific showing of prejudice, we do not find that the error was prejudicial. Thus, the error was harmless.

## IV. DENIAL OF A CONTINUANCE

The appellant next claims that the military judge erroneously denied his continuance request, which, in turn, denied him the right to obtain the assistance of an expert. Appellant argues that this denial went to the very heart of his defense since it prevented his counsel from effectively preparing his case, a right he is guaranteed under the Sixth Amendment.

 Article 40, UCMJ, grants a military judge the discretion to grant a continuance to any party for such time as the military judge deems just. *United States v. Plummer*, 1 U.S.C.M.A. 373, 3 C.M.R. 107 (1952). A military judge should exercise caution before denying a continuance if, in doing so, one of the parties might be deprived of essential evidence. *United States v. Browers*, 20 M.J. 356 (C.M.A. 1985). Thus, a military judge should liberally grant motions for delay as long as it is clear that a good cause showing has been made. *United States v. Dunks*, 1 M.J. 254, 255 n. 3 (C.M.A.1976); *United States v. Daniels*, 11 U.S.C.M.A. 22, 25, 28 C.M.R. 276, 279 (1959); *United States v. Nichols*, 2 U.S.C.M.A. 27, 6 C.M.R. 27 (1952). Early in the development of the law on continuances under the Uniform Code of Military Justice, the Court of Military Appeals stated that it believed "that law officers should weigh carefully the merits of a motion to continue and if it appears reasonable that it is not made on frivolous grounds or solely for delay, the request should ordinarily be granted." *Nichols*, 6 C.M.R. at 36. The Court went further to say that the "responsibility to make a full and fair disclosure of the necessity for, and the nature, extent and availability of, the desired evidence" was upon the counsel moving for the continuance; and if counsel failed to bear that

burden, the military judge would not be condemned for denying the continuance. *Id.* To bear its burden successfully, the moving party must show by a preponderance of the evidence that prejudice to the substantial rights of the moving party would occur if a continuance were not granted. *United States v. Dunks*, 1 M.J. 254 (C.M.A.1976). In determining whether the moving party has met its burden for granting a continuance, the military judge should weigh the underlying basis for the continuance against the adverse consequences to the prosecution in delaying the trial. Additional matters for consideration by the trial judge include the number and length of previous continuances, whether an additional continuance would inconvenience witnesses, opposing counsel or the court, and whether the delay would prejudice the accused. *See United States v. Stevens*, 27 M.J. 626 (AFCMR 1988); *United States v. Wilson*, NMCM 87 1977 (NMCMR 9 June 1989).

 The exercise of judicial discretion to grant or deny a continuance depends upon the circumstances of each case. *Daniels*, 28 C.M.R. at 279. "[A]n 'unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay' may result in a violation of an accused's right to the assistance of counsel." *Thomas*, 22 M.J. at 59, quoting *Morris v. Slappy*, 461 U.S. 1, 11–12, 103 S.Ct. 1610, 1616, 75 L.Ed.2d 610, 620 (1983), quoting *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921, 932 (1964). Only when a military judge abuses that discretion will the reviewing court consider reversing for refusal to grant a reasonable delay, *United States v. Daniels*, 11 U.S.C.M.A. 22, 25, 28 C.M.R. 276, 279 (1959), and then, only if the erroneous denial of the continuance materially prejudiced an appellant's substantial rights. *Id.* at 278; *United States v. Keys*, 29 M.J. 920 (ACMR 1989). Absent a showing of a clear abuse of discretion, then, the ruling of the military judge will not be overturned. *United States v. Menoken*, 14 M.J. 10 (C.M.A. 1982); *United States v. Johnson*, 20 U.S.C.M.A. 359, 43 C.M.R. 199 (1971); *United*

*States v. James,* 14 U.S.C.M.A. 247, 34 C.M.R. 27 (1963); *United States v. Daniels,* 11 U.S.C.M.A. 52, 28 C.M.R. 276 (1959); *United States v. Vanderpool,* 4 U.S.C.M.A. 561, 16 C.M.R. 135 (1954); *United States v. Rogan,* 8 U.S.C.M.A. 739, 25 C.M.R. 243 (1958); *United States v. Hutchinson,* 15 M.J. 1056 (NMCMR 1983), *rev'd as to sentence,* 18 M.J. 281 (C.M.A. 1984), *cert. denied,* 469 U.S. 981, 105 S.Ct. 384, 83 L.Ed.2d 319 (1984).

The courts have indicated situations in which they might find an abuse of discretion for denial of an accused's request for a continuance, such as where the basis for the request is grounded on a substantial right, and the prosecution's singular basis for opposition is administrative inconvenience. *United States v. Perry,* 14 M.J. 856 (ACMR 1982), *pet. denied* 16 M.J. 135 (1983); *United States v. Wilson,* NMCM 87 1977, (NMCMR 9 June 1989). The courts have also indicated that "if the request, though purporting to assert a substantial right, in fact does not do so or is not made in good faith but solely to vex the prosecution, it need not be countenanced and may properly be denied." *Perry,* 14 M.J. at 858; *United States v. Daniels,* 11 U.S.C.M.A. 52, 28 C.M.R. 276 (1959); *United States v. Alicea–Baez,* 7 M.J. 989 (ACMR 1979). We find no vexatious motive behind the defense request for the continuance; therefore, we are concerned solely with whether the appellant was denied a substantial right when he was denied his request for a continuance.

The appellant asserts two grounds for finding that the military judge abused his discretion in denying the continuance request: he ruled as a result of the unlawful command influence inflicted upon him; and he denied the defense the ability to prepare an adequate defense which, in turn, denied appellant the effective assistance of counsel, a violation of his rights under the Sixth Amendment. The defense asserts that the military judge denied the continuance because to do otherwise would delay the trial for a period of time and thus cost the Government money because witnesses who had been brought from geographical locations some distance from the situs of the court were already present and would either have to be sent home and then returned or paid while they waited for the court-martial to resume. This delay and resulting costs were exactly the concerns relayed to the military judge by the staff judge advocate, Captain Powell, during the disclosed but improper extra-judicial discussion. But for the potential costs resulting from the delay caused by any defense-requested continuance and the recent influence of Captain Powell, the defense would have been provided the assistance of an expert. Because the defense was denied the continuance, it was forced to proceed with trial unprepared to confront and cross-examine the Government's evidence, particularly its expert witness, Mr. Haver, and to present potential defense evidence, which, in turn, denied him the effective assistance of counsel.

 As to the defense assertion that Captain Powell's expression of delay and cost concerns to the military judge was unlawful command influence to which the military judge subordinated his discretion, we find it without merit. Other than the bare assertion of the fact of communication, the defense puts forth no evidence supporting its proposition that the military judge exercised his discretion against the defense because of that improper communication. As we have previously stated *supra,* the burden of raising the issue of unlawful command influence is upon the accused and he must do so by establishing the existence of at least the appearance of unlawful command influence. *See United States v. Rosser,* 6 M.J. 267 (C.M.A.1979). Assuming that the fact of the communication was sufficient to raise the issue of unlawful command influence, based on the military judge's disclosure of the conversation, his openness during *voir dire,* his statements that he completely disregarded the communication as improper, and the factual circumstances surrounding the request as it relates to the law, which we will hereinafter discuss, we are led to conclude that the military judge was not in any way influenced by that communication when he denied the continuance.

Resolution of the issue of whether the military judge abused his discretion in denying the continuance focuses primarily, therefore, on whether the appellant was entitled to expert assistance.[25] If the defense was entitled to the expert assistant and was denied that assistance, then that denial impacts on the question of whether the appellant was denied the effective assistance of counsel. If we should determine that such was the case, then it follows that the military judge abused his discretion since denial of effective assistance of counsel is a fundamental right of an accused. *United States v. Clay*, 1 U.S.C. M.A. 74, 1 C.M.R. 74 (1951). Any prejudice resulting therefrom would have to be determined on the basis of the constitutional standard, *i.e.*, harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *United States v. Davis*, 26 M.J. 445 n. 4 (C.M.A.1988).

First, we look at the language used by the military judge when he denied the defense the continuance:

MJ: Well, at this point in time, given the stance of this trial, at this point in time, and given the representation by both sides as to staging of motions and commencing the trial on the merits, it's my intention to proceed on the merits next week. Now, as I said, I'm trying to bend over backwards to accommodate your needs in this area, but the clock is running and I don't know what else to even suggest to you. The Government has apparently indicated through Mr. Haver, sources that might be available to you that can help you. Now, I don't know what else to suggest to you, counsel, but we are proceeding in accordance with the schedule we've set out and agreed to. It appears that all efforts are being made. I know, I, as the military judge, am attempting as best I can to accommodate you in this area, so something has got to give here.

Later, after following the Government's suggestions, the civilian counsel made the

continuance motion again and the military judge stated:

MJ: Well, let's close this out, I think again we have addressed it enough that at this point in time my position as the trial judge in this case will be to be *sensitive to the Government obtaining an unfair advantage over the defense* with respect to use of an expert. Unless that occurs, at this point in time it looks like your [sic] going to have to proceed to trial with Mr. Orme and utilization of the Government expert or any other resources that you might have available to you at this time. But I—I think at this point in time you're going to have to demonstrate that the Government has obtained an unfair advantage over you trough (sic) the use of their expert in order to get any further relief in this area.... (Emphasis added.)

Finally, the military judge stated:

MJ: During prior sessions this issue has been addressed rather extensively, and it strikes me that the court position with respect to this matter is clear at this time and I'm not going to go over that position again. It's a matter of record. At this time I'm going to deny your request for a continuance....

Before we focus on resolving the question of the reasonableness of the denial of the continuance as it interrelates to the validity of the defense request for expert assistance, we must clarify two points. First, we find no evidence in the record indicating that the Government believed it would be in any way prejudiced by a reasonable delay, other than the possibility of witness travel and per diem costs. Second, we find no precedent for the military judge's "sensitiv[ity] to the Government obtaining an unfair advantage" as a standard for determining whether expert assistance must be provided or whether he should reconsider his ruling on the continuance. Appellate Government counsel cite *United States v. Garries*, 22 M.J. 288 (C.M.A.1986), *cert. denied*, 479 U.S. 985, 107

**25.** We note that appellant requested expert assistance, *not* an expert witness, *see Garries*, 22 M.J. at 288, and *True*, 28 M.J. at 1057, although

we fully recognize that providing expert assistance could turn into a request for the production of an expert witness.

S.Ct. 575, 93 L.Ed.2d 578 (1986), in support of the military judge. We do not find that case dispositive. Although the *Garries* court does mention "undue advantage to one party" it does so in connection with the military judge's "inherent, but rarely appropriate, authority" to use *ex parte* hearings. In appellant's case, the military judge was not using the "undue advantage" standard to rule on an *ex parte* hearing question. Instead, he was determining whether the defense was entitled to a continuance to obtain an expert assistant. A military judge must determine, based upon the evidence before him at that time, whether the defense is entitled to the expert assistance, and if so, whether a continuance was necessary to fulfill that entitlement. If the defense should have been provided the expert assistance requested, then the defense would have shown reasonable cause for the granting of a continuance. Thus, the propriety of the military judge's ruling on the request for expert assistance will determine the propriety of his denying the continuance.

### A. *Expert Assistance*

The Sixth Amendment guarantees the appellant the right to the effective assistance of counsel. This right includes the right to present a defense by means of confrontation, cross-examination and going forward with a presentation of its own evidence. The right to present evidence necessarily includes the right to prepare. Military due process entitles a servicemember to the assistance of an expert when necessary to the preparation of an adequate defense. *United States v. Garries,* 22 M.J. 288 (C.M.A.1986), *cert. denied* 479 U.S. 985, 107 S.Ct. 575, 93 L.Ed.2d 578 (1987). "Necessity" has been defined by the Federal courts as "reasonably necessary." *United States v. Durant,* 545 F.2d 823 (2d Cir.1976).[26] "Adequate defense" has been defined as including "preparation for cross-examination of a government expert as well as presentation of an expert

defense witness." *Durant,* 545 F.2d at 827. The standard for evaluating the necessity for the defense to have expert assistance has been more liberally interpreted by the Federal courts than has the standard for production of an expert witness. The Federal courts' liberal treatment of such motions is due to the legislative history of 18 U.S.C. § 3006A, which discloses that the statute was meant to ensure that there was "equality between 'indigents and those who possess the means to protect their rights'" because "the right is crucial to the adversary system," is founded on the "due process requirement of a fair administration of justice," and "goes to the very trustworthiness of the criminal justice process." *United States v. Theriault,* 440 F.2d 713 (5th Cir.1971).

The servicemember bears the burden of demonstrating the necessity for the expert assistance he requests. *United States v. Mustafa,* 22 M.J. 165, 167 (C.M.A. 1886); *United States v. Mann,* 30 M.J. 639 (NMCMR 1990); *United States v. True,* 28 M.J. 1057 (NMCMR 1989); *United States v. Tornowski,* 29 M.J. 578 (AFCMR 1989); *United States v. Kinsler,* 24 M.J. 855 (ACMR 1987); *See Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). There are three aspects to showing necessity. First, why the expert assistance is needed. Second, what would the expert assistance accomplish for the accused. Third, why is the defense counsel unable to gather and present the evidence that the expert assistant would be able to develop. *True,* 28 M.J. at 1061; *Mann,* 30 M.J. at 642. In particular, the defense must show what it expects to find, *Moore v. Kemp; United States v. Mundt,* 508 F.2d 904 (10th Cir.1974); *see United States v. Fontenot,* 26 M.J. 559 (ACMR 1988); how and why the defense counsel and staff cannot do it, *Moore v. Kemp,* 809 F.2d 702 (11th Cir. 1987); *United States v. Kasto,* 584 F.2d 268 (8th Cir.1978); how cross-examination will be less effective without the services

---

**26.** *Durant* interprets 18 U.S.C. § 3006A, the provisions of which the Court of Military Appeals has held inapplicable to the military. *Garries,* 22 M.J. at 288. Although the Federal statute is inapplicable and it is not the basis for a service-

member's right to expert assistance, military due process does provide that right and Federal court precedent is a valuable tool for defining that right in the absence of any military judicial precedent. *See Garries.*

of the expert, *United States v. Brewer*, 783 F.2d 841 (9th Cir.1986); how the alleged information would affect the Government's ability to prove guilt, *United States v. Fazzini*, 871 F.2d 635 (7th Cir.1989); what the nature of the prosecution's case is, including the nature of the crime and the evidence linking him to the crime, and how the requested expert would otherwise be useful.

■ Based upon all of the evidence presented, the military judge then must determine whether the defense has borne its burden by applying the standard of whether a reasonable probability exists that the expert services requested would be of assistance and that denial of that assistance would result in a fundamentally unfair trial. *Mann*, 30 M.J. at 641; *United States v. Van Horn*, 26 M.J. 434 (C.M.A. 1988).

As we did in *Mann*, we commend the military judge and counsel involved for their extensive attempt to deal with the complex and thorny issue of an accused's right to Government-funded expert assistance prior to trial. But, also, as in *Mann*:

> [w]hen, as here, the prosecution utilizes expert opinion in developing its ... case for prosecution, an accused may well be able to make plausible and valid arguments for Government or Government-funded expert assistance on his behalf to aid in the development and evaluation of factual issues and to ensure his adequate legal representation.

*Mann*, 30 M.J. at 642; *see Ake v. Oklahoma*, 470 U.S. 68, 83, 105 S.Ct. 1087, 1096, 84 L.Ed.2d 53, 66 (1984). In fact, as to the expertise at issue at appellant's court-martial, it was recognized early in military judicial precedent under the UCMJ that expert testimony was admissible in cases involving unauthorized disclosure of classified information because "the classification of military information requires a knowledge and experience not generally possessed by men of common education and experience...." *United States v. Grow*, 3 U.S.C.M.A. 77, 85, 11 C.M.R. 77, 85 (1953). It logically follows that expert assistance

should also be made available in such instances. *See Ake v. Oklahoma.*

In appellant's case, the military judge did not specifically deny appellant's request for expert assistance. He did identify, however, the items that the Government's expert witness would testify to as (1) proper procedures for classification; (2) whether a document was properly classified; (3) whether damage has occurred because of the disclosure; and (4) what the damage was. R. 283. He implicitly concluded that the defense was requesting assistance to better address those four points. Much later in the proceedings, the military judge also identified a fifth reason the defense needed an expert, *i.e.*, "you need someone who is acquainted with the (intelligence) situation in the Philippines." R. 528. The military judge then made what we will consider an interim ruling on the defense's need for an expert assistant: "it occurs to me that the defense ought to have access to someone who has the background and experience to address these issues to assist them to prepare to meet the Government's case in that area." R. 284. The military judge further decided, with the defense counsel's concurrence, that the Government was not being unreasonable in asking the defense to speak to its expert first "to decide whether or not you need someone with expertise in this area before we really get a determination on that question." *Id.*

The defense did consult with the Government's expert, Mr. Haver, and with two other potential experts as suggested by Mr. Haver. The results of those consultations were proffered by the defense as insufficient to meet the needs of the defense. R. 528–538. Their chief argument rested on the principle that it was unreasonable to expect the Government's key expert witness to assist the defense in impeaching his own testimony. In addition, both experts the defense interviewed at the suggestion of Mr. Haver told counsel they did not have the expertise the defense required. Yet, as we interpret the proceedings, his denial of the defense's continu-

ance request resulted in his denial [27] of the defense request for a Government expert on documents classification and foreign counterintelligence. Reasonableness is the standard for appellate review of the military judge's ruling. *Mann*, 30 M.J. at 641. Our assessment of whether the military judge met the reasonableness standard when he implicitly denied the expert assistance, *Garries*, 22 M.J. at 288, *Moore v. Kemp*, 809 F.2d at 702, is made in light of the evidence he had before him at the time of his ruling, *Mann*, 30 M.J. at 641, and turns on whether the appellant sufficiently explained his need for the expert, *Mann*, 30 M.J. at 641; *Moore v. Kemp*, 809 F.2d at 710; *see True*, 28 M.J. 1057.[28] and whether the military judge should have concluded, after hearing the explanation, that "unless he granted his request, [appellant] would likely be denied an adequate opportunity fairly to confront the [Government's] case and to present his defense." *Moore v. Kemp*, 809 F.2d at 710.

Why then did the military judge deny the continuance and thus the request for expert assistance? Was it because he believed the defense was on a fishing expedition as prohibited by *United States v. Kinsler*, 24 M.J. 855 (ACMR 1987)? *See Garries*, 22 M.J. at 291. Or was it because he believed that, although the defense theory was valid, as specifically identified by him, they failed to present sufficient evidence in support of their theory as they were required to do? The latter appears more plausible, particularly in light of the fact the defense would not disclose the information/evidence that it believed the expert assistance could provide because to do so would disclose the defense theory of the case.[29]

"The military judge made his ruling as follows: [M]y position as trial judge in this case will be to be sensitive to the Government obtaining an unfair advantage over the defense with respect to use of an expert. Unless that occurs, at this point in time it looks like your [sic] going to have to proceed to trial with Mr. Orme and utilization of the Government expert or any other resources that you might have available to you at this time. But I—I think at this point in time *you're going to have to demonstrate that the Government has obtained an unfair advantage over you trough [sic] the use of their expert in order to get any further relief in this area.*" (Emphasis added.)

R. 616.

Was this the military judge's manner of saying that the defense had failed, at that point in the trial, to show necessity? That if he subsequently found unfair advantage he would reconsider the necessity for expert assistance for the defense? We will examine the record and determine whether the defense made the requisite showing of need to warrant the production of expert assistance. If we find that they did, we must then determine whether the denial of the expert assistance prevented the defense from adequately preparing and presenting appellant's case at trial. Our determination of the reasonableness of the military judge's denial of the defense request for continuance, then, is dependent upon our resolution of those questions.

For an expert assistant to be necessary for the preparation of an adequate defense, the information he can provide must be material. Such information is material if it

---

27. The military judge never specifically ruled on the defense request for expert assistance.

28. In other words, has he exhausted all other efforts. The defense counsel has the responsibility for investigating the defense case, *Mann*, 30 M.J. at 639; "defense counsel is obligated to inform himself about the specific scientific area in question and to provide the court with as much information as possible concerning the usefulness of the requested expert to the defense's case." *Moore v. Kemp*, 809 F.2d at 712; *Mann*, 30 M.J. at 640.

29. The defense understood the military judge's reluctance to hold an *ex parte* meeting with the defense and, therefore, said it would continue the best it could. We also note that there is Federal authority (18 U.S.C. § 3006A) and a military judge's inherent authority for permitting such a procedure, *Garries;* but, that the Court of Military Appeals specifically rejects the idea of *ex parte* meetings to allow the defense to disclose the reasons behind its request of expert assistance to the military judge without the presence of the prosecution. *Garries*, 22 M.J. at 291.

helps to negate the Government's evidence or supports the defense. As we understand the defense position at trial, the defense wanted the expert assistance to help it defend against the testimony of the Government's expert, Mr. Haver, as his testimony related to the charges and specifications alleging espionage and unauthorized disclosure of information pertaining to the national defense. To evaluate the validity of the defense request, then, we must first determine the elements of the offenses to which the requested assistance allegedly related.

### B. *The Offenses*

Appellant was charged with two specifications of Article 106a, the elements of which are:

(a) That the accused communicated, delivered, or transmitted any document, writing, ... or information relating to the national defense;

(b) that this matter was communicated, delivered, or transmitted to any foreign government, or to any faction or party or military or naval force within a foreign country, whether recognized or unrecognized, by the United States, or to any representative, officer, agent, employee, subject or citizen thereof, either directly or indirectly; and

(c) that the accused did so with intent or reason to believe that such matter would be used to the injury of the United States or to the advantage of a foreign nation.

Paragraph 30 b(1), Part IV, MCM, 1984. Appellant was also charged with one specification of violating 18 U.S.C. § 793(d) in violation of Article 134(1), UCMJ, the elements of which are that a person must:

(a) lawfully have possession of, access to, control over, or been entrusted with any document, writing, ... or information relating to the national defense

(b) which information the possessor has reason to believe could be used to the

injury of the United States or to the advantage of any foreign nation, and

(c) willfully communicate, deliver, transmit or cause to be communicated, delivered, or transmitted or attempt to communicate, deliver, transmit or cause to be communicated, delivered or transmitted the same to any person not entitled to receive it.

What evidence [30] did the military judge have before him that would justify his granting the defense's request for an expert assistant? Let us begin by relating the evidence of record to the three *Garries* aspects for showing necessity.

Appellant states in his discussion of this assignment of error that the *defense theory* at trial for which the requested assistance of an expert was needed to support was that "the material the accused was alleged to have communicated was not classified at all, but information in the public domain in the Philippines. Just because NIS had classified the information does not *ipso facto* make it classified." Appellate Defense Brief at 125. The appellate defense brief further explained the trial defense theory by stating:

the defense had reason to believe that a significant portion, if not all of the material contained in the prosecution messages was matter reported in the Philippine press or was otherwise public domain. Only an expert in Philippine intelligence on a national level could present this matter cogently. Indeed, an expert could tell the defense whether the information was not only public, but whether the source was the Philippine Government itself! It could hardly be a crime to communicate to the Philippine Government information which it already knew. Moreover, if there was disclosure, an expert in Philippine intelligence would be most likely to know if the Philippine Government would benefit from the information or whether the United States was likely to be harmed by the disclo-

---

**30.** Unlike the military judge in *Mann,* neither the military judge nor trial counsel in appellant's case objected to defense counsel's proffers such that testimonial or other evidence support-

ing the proffers was required. Therefore, we, too, though reluctantly, are required to consider the proffers of both counsel as evidence on the issue.

sure. Both harm and benefit are elements of the espionage offense.

The appellant in his brief further explains the trial defense theory:

[t]he person the defense was seeking would be the person who would either head the American intelligence gathering operation in the Philippines, or be among the top officials in that operation. The only realistic option that the defense had was to wait until Mr. Haver located an expert.[31]

Finally, the appellant states that "[i]f the defense had access to the services of an expert, it might have been able to pinpoint exactly what source provided that information to the Philippine Government. Despite Agent Kunagonis' assertions to the contrary, the defense insists that the source was not the accused." [32]

Although the defense at trial and on review did not specifically present its case for necessity by delineating the three aspects of *Garries,* we have gleaned from the defense presentation the trial counsel's comments in response and the military judge's findings what we believe the defense intended the delineation to be.

1. Why did the defense need the expert assistance? The defense counsel needed the ability to achieve some measure of understanding and expertise in the complicated and critical area of espionage, particularly as it related to the proper classification of documents and foreign counterintelligence, in order to demonstrate that the information appellant was alleged to have communicated was public information and therefore information falling outside that protected by Article 106a, UCMJ, or 18 U.S.C. § 793(d).

2. What would such assistance accomplish for the accused? Having the assistance of its own expert would allow the defense the opportunity to test through cross-examination the "self-serving state-

ments by prosecution witnesses who are 'under the gun' and who won't be satisfied with a 'relatively minor security violation.'" (COMUSNAVPHIL/NISRA Subic 221500Z Aug 89). The defense would be in the potential position to obtain favorable expert testimony to counter Government experts and thus have the "raw materials integral to the building of an effective defense."

3. Why were trial defense counsel and their staff unable to gather and present the evidence that the expert assistant would be able to develop? The issuance of a protective order by the military judge prohibited the disclosure of classified information and the nature of the classified documents. The defense, therefore, could not discuss the information with any expert without first getting authorization. Additionally, foreign counterintelligence and documents classification are areas of expertise that are not available in the civilian market but are solely within the realm of the Federal Government to which the convening authority, but not the defense, has unique access.

■■■■ Whether the evidence presented by the defense to show necessity was sufficient to meet its burden depends upon the prosecution evidence the expert assistance was intended to negate, or the defense it was needed to support. Upon examination of the elements as defined by case law, we found the following: First, the information communicated and delivered or attempted to be communicated and delivered "need not be 'classified' to constitute" a violation of 18 U.S.C. § 793(d). *United States v. Safford,* 40 C.M.R. 528, 532 (ABR 1967), *rev'd on other gds,* 19 U.S.C.M.A. 33, 41 C.M.R. 33 (1969). Second, if the information in question is not classified in accordance with security criteria, it must be information that is not gen-

---

**31.** Nothing exists in the record to explain why Special Agent Orme could or could not meet the defense's needs.

**32.** On the other hand, the Government argues first that appellant did not meet the requirements of R.C.M. 703(c)(2)(B). The require-

ments of R.C.M. 703(c)(2)(B) must be met when the defense is requesting the production of an expert witness. But the justification criteria that an accused must meet under R.C.M. 703 are inapplicable to an accused requesting expert assistance.

erally accessible to the public, *i.e.*, it must be non-public information. Although if information is obtained by researching, sifting and collating information from sources that are lawfully accessible to anyone willing to take the pains to do such, the results gained from such pains remains public information. *United States v. Heine*, 151 F.2d 813 (2d Cir.1945). Third, if the information obtained came from sources that were lawfully accessible to anyone in the United States, conviction for passing such information cannot stand against an individual who, for example, passes information made public by the armed services themselves or information the armed services never thought necessary to withhold. *Id.* Fourth, actual harm or benefit need not be proven by the Government before a servicemember can be found guilty of espionage activity in violation of 18 U.S.C. § 793(d) as incorporated under Article 134, UCMJ. *Gorin v. United States*, 312 U.S. 19, 61 S.Ct. 429, 85 L.Ed. 488 (1941). Fifth, the Government need not prove that the information obtained by the possessor and communicated to the unauthorized person was, in fact, to be used to the injury of the United States or to the advantage of any foreign nation, with no distinctions being made between friend or enemy. *Id; United States v. Heine*, 151 F.2d 813 (2d Cir. 1945). Sixth, the Government need only prove that the information was *intended* to be used to injure or advantage. *Id.* Seventh, the espionage act implies that information shall not be given even to an ally regardless of how innocent, or commendable a purpose the person disclosing the information had. *Id.* Applying these principles to the defense's request for expert assistance, we find that the defense failed to present sufficient evidence to bear its burden of showing necessity.

We note in addition that the record of trial, the briefs of appellant and in oral argument before us an attempt by the defense to shift its burden of establishing its case on the public domain or accessibility to the public issue to the Government. It is true, as we have recently stated, that the "Government is not obligated to provide funding to lay the groundwork for an expert witness request, ... it is obligated to provide expert assistance so that the defense acquires the knowledge necessary for preparing and presenting its case." *Mann*, 30 M.J. at 643. It is also true, however, that "the duty of counsel, whether prosecuting or defending, is to educate themselves concerning any issues involved in their case. Sole reliance on the advice of experts is no substitute for the hard work required to obtain the knowledge necessary to prepare a client's case for trial." *True*, 28 M.J. at 1062.

█ Thus, in appellant's case, when we compare the evidence on the *Garries* aspects as presented by the defense with the offenses and defense against which the materiality of their expert assistance request is to be judged, we find the defense position deficient. The defense claimed at trial and claims again before us that the information appellant allegedly communicated to the Philippine Constabulary was information in the public domain such as in the Philippine press. If that were the case, then the defense did not need a national security expert to identify press articles relating identical or substantially similar information as that contained within the messages the Government identified as classified or information inaccessible to the public. Whether the information was or was not classified was of little moment in light of *Heine* and the defense theory that it was within the public domain; and, whether the information communicated to the Philippine officials actually harmed the United States or advantaged the Philippines is also immaterial in light of *Heine*. Additionally, appellant's confessions remove any doubt as to whether he had reason to believe the information he delivered or communicated could be used to the injury of the United States or to the advantage of the Philippines because he indirectly admitted he understood the information was not within the public domain and not accessible to the public when he stated that he always used operational security when dealing with those officials and the information he was communicating. He also admitted that the information he communi-

cated was sought and well-received by these officials. Additionally, he admitted that he delivered or communicated the information in order to gain favor with the constabulary heirarchy so as to place himself in a better position within their ranks. His intent was therefore to advantage the Philippines. It is otherwise ludicrous to believe that he could expect to gain favor with information that would not be of advantage to them. We find that the defense did not require expert assistance to demonstrate that the information that the appellant communicated was in the public domain and thus negate the Government's case; or, it did not bear its burden of providing the military judge with the specific necessity for the expert assistance it was requesting. Although the military judge used the wrong standard for determining the necessity of the requested witness, he did alert the defense to their responsibility for identifying more specifically how an expert assistant could help them negate the Government's evidence—as presented by Mr. Haver, the Government's expert—or support the defense theory that the information communicated was public domain—as refuted by Mr. Haver. We might have been confronted with an entirely different proposition had the defense renewed its request and specified its need subsequent to Mr. Haver's testimony. *See United States v. Burnette*, 29 M.J. 473, 476 (C.M.A.1990). In other words, the defense failed to pass the test of necessity and materiality.

Accordingly, the military judge acted reasonably, did not abuse his discretion, and thus did not err when he denied the defense request for a continuance since the defense failed to establish that the underlying basis for the request, *i.e.*, the opportunity to seek expert assistance, was a substantial right without which he would be prejudiced.

## V. SEARCH AND SEIZURE

Appellant asserts that Rear Admiral Lewin, Commander, U.S. Naval Forces, Philippines, lacked the independent judgment necessary to act as a neutral and detached magistrate in approving a search authorization for appellant's off-base housing in the Philippines. Further, appellant challenges the authority of Rear Admiral Lewin to order an off-base search of appellant's home, as his deliberate and willful disregard of the requirements set forth in the military bases agreement with the Philippine Government should prompt this Court to rule that Mil.R.Evid. 315(h)(3) violates international law and cannot stand. Evidence crucial to the Government's case should have been suppressed, he argues, and the failure to do so was prejudicial error.

A commander who has control over the place where the property or person to be searched is situated or found, or has control over persons subject to military law, may authorize a search upon a showing of probable cause to believe evidence of criminal activity exists on the person or in the place to be searched, *if* that commander possesses the requisite neutrality and impartiality. Mil.R.Evid. 315(d)(1), (f)(2). The search of appellant's off-base housing in the Philippines was lawful[33] if the commander was neither (a) involved in the competitive enterprise of ferreting out crime nor (b) otherwise predisposed against appellant so as to disqualify himself from serving as a neutral and detached magistrate. *United States v. Ezell*, 6 M.J. 307 (C.M.A.1979). The difficulty is that the commander who authorizes a search of a person or place under his control is required both to insure the safety and proper functioning of his command, and to utilize the mental processes required under the Fourth Amendment. That is, a commander must be able to separate his responsibilities and maintain the requisite judicial attitude toward making determinations of the existence of probable cause. *Id.; United States v. Acosta*, 6 M.J. 992 (NMCMR 1979), *aff'd* 11 M.J. 307 (C.M.A.1981); *see United States v. Staggs*, 23 U.S.C.M.A.

---

**33.** Our use of the term "lawful" assumes that the commander was in compliance with the provisions of Mil.R.Evid. 315(c)(4)(B) despite the fact that his non-compliance would not affect the admissibility of the fruits of the search.

111, 48 C.M.R. 672 (1974). A commander who acts as would a policeman or prosecutor might compromise this required neutrality and impartiality, and be disqualified from issuing legal search authorizations. *See United States v. Murray,* 12 M.J. 139 (C.M.A.1981); *United States v. Wenzel,* 7 M.J. 95 (C.M.A.1979). In this case, then, the critical issue is whether Rear Admiral Lewin was sufficiently disengaged from law enforcement activities so as to be capable of the neutrality and detachment necessary to determine the existence of probable cause and thus to authorize the lawful search of appellant's quarters.

Appellant points to the following as evidence that Rear Admiral Lewin neither acted as a neutral and detached magistrate nor exercised independent judgment in ordering the search of appellant's quarters.

(1) RADM Lewin was briefed almost daily over a period of 4 months by LCDR McPherson, the legal advisor to both the Naval Investigative Service and RADM Lewin during that period.

(2) RADM Lewin authorized an emergency wiretap of appellant's work phone on 30 Sept 86.

(3) RADM Lewin authorized the use of a bogus naval message to attempt to catch the accused passing information, and extended the wiretap of the accused's phone on 2 October.

(4) RADM Lewin approved a draft of a press release describing the apprehension of appellant, and originated and forwarded a request to the Secretary of the Navy for permission to apprehend the accused. This occurred 5 weeks prior to the date of the search authorization.

Appellant contends that this level of participation in this investigation of appellant was partisan, and that RADM Lewin was an "active participant in the process of ferreting out criminal evidence." *Ezell,* 6 M.J. at 337. The briefings of LCDR McPherson, he asserts, were not of a neutral or impartial bent, and RADM Lewin, after receiving them, could not have maintained the required neutral vantage point concerning evidence against appellant. He further maintains that the Admiral's duty

under *U.S. Navy Regulations* to insure the health, safety, and welfare of his command, and the practical reality of this imperative was that the decisive actions he took, ostensibly necessary to fulfill his command duties, conflicted with his duty to evaluate the evidence against appellant dispassionately. It was this conflict, exacerbated by the daily briefings of LCDR McPherson, and evidenced by the actions taken to further and buttress the NIS investigation against appellant, that shows both that he did not and was incapable of functioning as would a Federal magistrate.

We find that appellant failed to carry his burden to show that RADM Lewin did not act in a neutral and impartial manner in issuing the search authorization for appellant's house. We further find that he exercised his independent judgment in limiting the scope of that search, and that his activities in authorizing the wiretap of appellant's phone and approval of the use of a bogus naval message as investigatory tools were not actions which so involved him in the investigation of appellant that he could not or did not evaluate the evidence against appellant with neutrality and impartiality when issuing the search authorization.

■ RADM Lewin, in his stipulated testimony admitted at trial, indicated that although he attended those briefings, he neither offered or expressed any comments, opinions, or directions concerning the investigation. Attending such briefings, in and of itself, does not disqualify an otherwise impartial authorizing official. *Guerette,* 23 U.S.C.M.A. at 283, 49 C.M.R. at 532. Neither does the record suggest that RADM Lewin's authorization of wiretaps or use of bogus messages were made in other than an impartial manner, actions he may authorize without losing his power to issue search authorizations upon determination of probable cause. *See* Mil.R.Evid. 315(d). Further, in ordering a criminal investigation into the suspected criminal activity of an individual, a commander does not participate in the investigatory process to the extent that his authority to authorize a lawful search upon probable cause is divested. *United States v. Martin,* 3 M.J.

744 (NMCMR 1977), *aff'd*, 7 M.J. 47 (C.M. A.1979). We further find no indication in the record that RADM Lewin surrendered his independent judgment to LCDR McPherson concerning probable cause to authorize a search, particularly when he refused to authorize a search of appellant's vehicle, as suggested by LCDR McPherson. Simply because RADM Lewin signed a search authorization document prepared by LCDR McPherson does not suggest in any way that he did not exercise independent, impartial judgment in determining the existence of probable cause. Equally clear is that appellant has no standing to object to a failure to comply with of the provisions of the military bases agreement between the United States and the Republic of the Philippines in the conduct of this search. *See* Mil.R.Evid. 315(c)(4)(B), (h)(3); *United States v. Alleyne*, 13 M.J. 331 (C.M.A. 1982).

 In short, this assignment of error is without merit. The appellant has failed to show that this search was not based on probable cause, or that RADM Lewin was not impartial and neutral in that determination.

## VI. EVIDENCE OF CORROBORATION

Prosecution Exhibit 50 is in what the Court considers two parts: a two-page carbon copy letter with a typed vice printed letterhead allegedly signed by Sergeant Tungol and a single typed undated/unsigned no letterhead page with carbon copy which has on it six, three to four line, paragraphs. The date of the two-page signed letter is 30 July 1986. All but two of the six paragraphs on the unsigned/undated paper refer to dates occurring subsequent to 30 July 1986. The two-page signed letter contains no reference to the one page nor does the one-page refer to the letter or in any way relate to the information contained in the two-page letter. At trial the government authenticated the document by calling Special Agent Kunigonis of the NIS who testified that he received the document from Colonel Aguilar, commander of the 164th Philippine Constabulary Detachment during a meeting he had with the Colonel shortly after appellant's apprehension. The defense objected to its admissibility on the grounds that it was double hearsay as to the contents having been prepared by Sergeant Tungol and that the statement that the information came from the accused was uttered by Colonel Aguilar, neither of whom were present for cross-examination. In fact, Sergeant Tungol was dead at the time of trial. Additionally, the defense objected on the grounds that the Government had failed to show that the document was not an official Philippine Government document. The trial counsel countered by arguing that the Colonel's handing the document to Special Agent Kunigonis was an "operative fact" and therefore not hearsay. Furthermore, the trial counsel proffered that the document was not offered by the government to prove the truth of the contents but solely for the purpose of showing that its contents were similar to the contents contained in three classified naval messages (Prosecution Exhibits 20, 32a and 48) to which the prosecution had evidence showing appellant had access. The Government also offered the document to corroborate the appellant's statement that he had communicated classified information he had obtained from messages he accessed at NTCC to the Philippine Government. The military judge admitted the document solely for the purpose of corroborating the appellant's statement. The military judge further limited the use of the agent's testimony, however, when he cautioned counsel not to tell the court members that Colonel Aguilar told Special Agent Kunigonis that the appellant had given him the information. When Special Agent Kunigonis testified as to his recognition of Prosecution exhibit 50 he stated:

Yes, I do. This is the document that Colonel Aguilar handed to me during the course of my interview with him concerning Michael Allen.

R. 873. The defense objected to this response and called for an Article 39(a) session where they asked for a mistrial or, in the alternative, for exclusion of the document. The military judge acknowledged that "the response would allow the members to infer that it came from Michael

Allen" but refused to grant any of the defense-requested remedies. When the trial resumed before members, the military judge instructed the members to disregard anything that Special Agent Kunigonis testified to previously. The agent was questioned again about where the document came from and he stated that he got the document from Colonel Aguilar. He testified to no other facts. Defense again objected, unsuccessfully, but this time on the ground that Prosecution Exhibit 50 was the only evidence showing actual communication of any information by the accused to the Philippine Government and that since that made the Government's case against the accused, the members would be unlikely to disregard it.

During closing argument, the trial counsel argued that Prosecution Exhibit 50 was the "independent evidence" that proved communication of classified information to the Philippine Government and that that information came from Colonel Aguilar of the Philippine Constabulary intelligence unit.

Appellant now contends that the military judge's error in admitting the document was twofold: lack of authenticity and relevancy. Appellant argues that to meet the admissibility requirement, the prosecution must demonstrate that it was a communication made by the appellant to the Philippine Government, i.e., the document is what it purports to be. The defense contends that nothing in the Government's evidence would support such a finding or inference. The appellant urges that the Government has shown no evidence linking Prosecution Exhibit 50 to him; that the Government was relying on an improper inference, that is the information contained in Prosecution Exhibit 50 could only have come from appellant since he had access to both the classified naval messages and the Philippine Constabulary. The appellant points out the flaw in the inference when he states that since both governments were active collectors of the information contained in Prosecution Exhibit 50, no logical inference can be developed that the classified naval messages were the source of the information; therefore, the document is ir-

relevant. The defense additionally claims that in order for a communication to be to a foreign government, the foreign government must take cognizance of the information; and, the fact that Special Agent Kunigonis was handed the document does not fulfill that critical step.

Finally, appellant contends that the erroneous admission of Prosecution Exhibit 50 prejudiced him because the trial counsel argued on findings first, that the document was authentic and the accused was the source; and second, that the only direct evidence of appellant's communicating anything to the Philippine Government was the spontaneous statement made by Special Agent Kunigonis that Colonel Aguilar had given him the information when he asked him to provide information in relation to appellant. All in all, appellant claims that he was required to defend against innuendo, a situation Military Rule of Evidence 901 was designed to prevent.

The Government contends that it did not have to link the exhibit to appellant nor prove that Prosecution Exhibit 50 was a communication made by appellant to the Philippine Government. Prosecution Exhibit 50 was used by the prosecution as "independent evidence" to corroborate the essential facts admitted by the appellant in his confession and thus sufficiently justify an inference of their truth citing in support Mil.R.Evid. 304(g). The Government further advocates that the independent evidence necessary to establish corroboration is sufficient if it establishes "that the injury for which the accused confesses responsibility did-in-fact occur, and that some person was criminally culpable." Here they cite *United States v. Yates*, 24 M.J. 114, 116 (C.M.A.1987) (quoting *Wong Sun v. United States*, 371 U.S. 471, 489 n. 15, 83 S.Ct. 407, 418 n. 15, 9 L.Ed.2d 441, 449 n. 15 (1963)), *cert. denied*, 484 U.S. 852, 108 S.Ct. 154, 98 L.Ed.2d 109 (1987) to support their position. The Government contends that Prosecution Exhibit 50 evinces a document in possession of the Philippine Government that contains classified information which is similar to classified information held by the U.S. Government and to

which the appellant had access and that that similarity of information and opportunity for access created an inference establishing that such information had been communicated, inferentially by appellant, to a foreign government. The weight to be given the validity or invalidity of the inferences raised in Prosecution Exhibit 50 does not determine its admissibility.

The Government asserts that it properly authenticated Prosecution Exhibit 50, as required by Mil.R.Evid. 901(a), because the question to be resolved was whether a foreign nation was in receipt of U.S. Government classified information and that question was answered by Special Agent Kunigonis when he testified that he obtained Prosecution Exhibit 50 from an officer of the Philippine Constabulary. In support of this proposition the Government states that the production of the document by an officer of a foreign nation is implicit authentication which satisfies Mil.R.Evid. 901, with citation to *United States v. Brown*, 688 F.2d 1112, 1116 (7th Cir.1982). Whether such an inference had any probative value or credibility was also for the court members to decide.

▬▬ We agree with the Government and hold that Prosecution Exhibit 50 was properly authenticated and relevant. The argument made by appellant goes not to the document's admissibility, but to the weight the fact-finder should give the evidence, including all inferences raised by the evidence, during its deliberations on findings. First, we believe Prosecution Exhibit 50 is non-hearsay evidence introduced to show that a document containing information similar to that found in Prosecution 50 was in the hands of a Filipino official who was the direct and immediate superior commanding officer of appellant's admitted contacts within the Philippine Constabulary. When Special Agent Kunigonis testified that he received the document from Colonel Aguilar, he identified the document as what it purported to be, a document which had been in the hands of such a Filipino official (a fact of which he had personal knowledge). *United States v. Dababneh*, 28 M.J. 929 (NMCMR 1989). The

evidence was sufficient to prove by a preponderance of the evidence that the document was what the Government purported it to be. *See id.; United States v. Lewis*, 19 M.J. 869 (AFCMR 1985). No hearsay foundation was required since the document was not introduced for the truth of the matters related therein. *Id.* Second, its relevancy related to the correspondence between the contents of Prosecution 50 and the contents of Prosecution Exhibits 20, 32a and 48, documents to which the Government had demonstrated previously the appellant had access to and had, or probably had, read. *See United States v. Richendollar*, 22 M.J. 231 (C.M.A.1986).

▬▬ Turning now to the sufficiency of Prosecution Exhibit 50 corroborating the appellant's confessions, we note the Court of Military's Appeal's recitation of the purpose of a corroboration rule.

That "purpose is to prevent 'errors in convictions based upon untrue confessions alone'" or suspect convictions based upon words which might "reflect the strain and confusion" caused by "the pressure of a police investigation." *Smith v. United States*, 348 U.S. 147, 153, 75 S.Ct. 194, 197, 99 L.Ed. 192 (1954).

Appellant does not challenge the voluntariness of his confessions, Prosecution Exhibits 52 and 53, for any reason, including alleging oppressive police interrogation techniques. Thus, it was a voluntary confession and admissible. It merely had to be corroborated; but, it had to be corroborated by independent evidence which only needed to raise an inference of truth of the essential facts admitted therein. Determining whether corroborative evidence offered by the Government is sufficient to permit admission of an accused's confession is the sole responsibility of the military judge. Mil.R.Evid. 304(d).

Military Rule of Evidence 304(g) provides the standard that must be met before the military judge can accept an accused's confession or admission as evidence against him. Such corroborating evidence must be "independent evidence, either direct or circumstantial," and must corroborate "the

essential facts admitted to justify sufficiently an inference of their truth." Subsection (1) of the rule defines independent evidence as evidence that raises

> only an inference of the truth of the essential facts admitted. The amount and type of evidence introduced as corroboration is a factor to be considered by the trier of fact in determining the weight, if any, to be given to the admission or confession.

The independent evidence "need not be sufficient of itself to establish beyond a reasonable doubt the truth of facts stated in the admission or confession." The Court of Military Appeals in *United States v. Yeoman*, 25 M.J. 1, 4 (C.M.A.1987) has determined that the quantum of evidence needed to raise an inference under Mil.R. Evid. 304(g)(1) is "slight." In *United States v. Yates*, 24 M.J. 114, 116 (C.M.A. 1987), the Court, quoting *Wong Sun v. United States*, 371 U.S. 471, 489 n. 15, 83 S.Ct. 407, 418 n. 15, 9 L.Ed.2d 441, 449 n. 15 (1963), has also held that the independent evidence necessary to establish corroboration is sufficient if it establishes "that the injury for which the accused confesses responsibility did-in-fact occur, and that some person was criminally culpable"; independent evidence identifying the accused as the perpetrator is not required in every case. *Yates*, 24 M.J. at 116 citing *Opper v. United States*, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954); *Smith v. United States*, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192 (1954). This, we believe, is merely another way of stating the rule announced in *Smith v. United States*, 348 U.S. 147, 156, 75 S.Ct. 194, 198, 99 L.Ed. 192, 200 (1954):

> corroborative evidence does not have to prove the offense beyond a reasonable doubt, or even by a preponderance, as long as there is substantial independent evidence that the offense has been committed, and the evidence as a whole proves beyond a reasonable doubt that defendant is guilty.

The military judge admitted Prosecution Exhibit 50 for the limited purpose of corroborating appellant's statement in his confession that he communicated to Sergeants Tungol and Lapay, Philippine Constabulary personnel, U.S. Defense information he had extracted from classified naval messages he had obtained from NTCC Cubi.

Upon evaluating the evidence the Government had that provided substantial independent evidence that the offense had been committed, we find that the Government bore its burden. First, in his confession, appellant admitted that he had had dealings between mid–1985 and the time of his apprehension (4 December 1986) with Sergeant Tungol and after Sergeant Tungol's death with Sergeant Lapay, both members of the Intelligence and Investigations Branch, Philippine Constabulary, Camp Maquinaya, Olongapo City. Their boss was Colonel Aguilar. Second, during this time frame appellant admitted he read, copied, and extracted classified and unclassified information from naval messages (IRRs) he had access to at NTCC Cubi, took the copied messages or extracted information home with him to the Barrio, and on several different occasions provided such information that he had gained from those classified and unclassified naval messages to Sergeants Tungol and Lapay. Third, he passed this information to Tungol and Lapay either by typewritten reports or by oral communication. Fourth, he could not, however, remember any of the specific information he provided them; but he did admit that the information he provided was U.S. Defense Information. Fifth, he estimated that he provided Sergeant Lapay, no more than two times and Sergeant Tungol a maximum of 10 times written reports containing U.S. Defense information he had obtained from the classified messages. He gave both sergeants verbal reports of such information no more than six times. At trial evidence was adduced that showed the appellant read, copied, extracted and removed information from classified naval messages from NTCC Cubi during June–December 1986. Sixth, testimony of Special Agent Kunigonis established that Prosecution Exhibit 50 was obtained by him from Colonel Aguilar of the Philippine Constabulary during an interview with him at his quarters at Camp Maquinaya. Seventh,

the unsigned/undated page of Prosecution Exhibit 50 contains 3 paragraphs with information that directly corresponds to information contained in the classified naval messages denominated IRR's admitted as Prosecution Exhibits 20, 32a, and 48. The information was classified CONFIDENTIAL/NO FORN. Eighth, the dates contained within those six paragraphs are dates occurring within the mid–1985 to 4 December 1986 timeframe mentioned by appellant. Ninth, Special Agent Smith testified that appellant told him he had a relationship with Colonel Ben Aguilar of the Philippine Constabulary. Tenth, Prosecution Exhibits 3, 5, 6, and 14, admitted without objection, show appellant in receipt of mission orders (Philippine authority to carry a 9 mm Baretta semi-automatic pistol), appellant's receipt of a 9 mm Baretta pistol from the Philippine Constabulary, a Philippine identification card, and a note from Sergeant Tungol requesting he obtain information for him. Prosecution Exhibit 15, a video of NIS surveillance of appellant, and the testimony of Special Agent Jones relate the video surveillance of appellant during the period July–October 1986 which reveals appellant reading, copying, extracting, and removing information from classified IRRs or the IRRs themselves from NTCC Cubi. The surveillance video identifies the IRRs admitted by the Government as Prosecution Exhibits 18–49, which contain classified information. The evidence as a whole, therefore, created a strong inference of the truth of the contents of appellant's confession. *United States v. Mitchell*, 29 M.J. 854 (AFCMR 1989). The military judge could reasonably have concluded that the appellant had told the truth in his confession. *United States v. Melvin*, 26 M.J. 145, 147 (C.M.A.1988).

We find this independent evidence sufficient to justify an inference of the truth of the matters related by the appellant in his confessions. Article 66(c), UCMJ. Accordingly, the military judge did not err when he admitted Prosecution Exhibit 50 as corroboration of appellant's confessions.

## VII. FAILURE TO PAY

■ Retired members of a regular component of the armed forces who are entitled to pay are subject to trial by court-martial and may be held in pretrial confinement. Article 2(a)(4), UCMJ, 10 U.S.C. § 802(a)(4); R.C.M. 202(a), 305(b), JAGMAN 0116c. Because only service-members who are on active duty are entitled to basic pay of the pay grade to which they are assigned, 37 U.S.C. § 204(a)(1), a retired servicemember not on active duty is only entitled to retired pay. 10 U.S.C. §§ 1404–1408. The authorized pretrial confinement of appellant pending the disposition of charges against him created for him no entitlement to pay other than the pay he was already entitled to as a retired member of the regular component of the Navy not on active duty. Article 13, UCMJ, 10 U.S.C. § 813, was not violated. Furthermore, because court-martial jurisdiction over the appellant continued after he retired from the Navy and because he was entitled to and was drawing pay due to his status as a retiree, appellant was not subjected to involuntary servitude in violation of the Thirteenth Amendment to the Constitution, which in any case does not apply to the military. *See United States v. Shy*, 10 M.J. 582 (ACMR 1980), *pet. denied*, 10 M.J. 344 (C.M.A.1981). This assignment of error is meritless.

## VIII. DEPRIVATION OF RETIRED PAY

■ Appellant contends that his retirement pay was prematurely and improperly discontinued by the Government under 5 U.S.C. § 8312 and requests that this Court remedy this by ordering that the amounts taken be restored to appellant. This Court's jurisdiction is governed by Article 66(c), UCMJ. It does not provide us with any jurisdiction to determine the validity of appellant's assertion, entitlement to retirement pay and its termination, or to order the requested relief; such matters are for the civil courts. Appellant's recourse is to the United States Court of Claims. *See* 28 U.S.C. § 1491.

## IX. UNCONSTITUTIONALITY OF ARTICLE 92

■ Appellant asserts three bases for his theory that Charge I and its seven

remaining specifications in violation of Article 92, UCMJ, should be dismissed. First, Article 92 violates the constitutional doctrine of separation of powers. Second, Article 92 provides no standards for proscribing rules of conduct. Third, Article 92 fails to give a military retiree adequate notice of its proscriptions. As pointed out by the Government, *United States v. Scott*, 49 C.M.R. 213 (AFCMR 1974), *pet. denied*, 23 U.S.C.M.A. 633, 49 C.M.R. 213 (1975), appears to be the only case addressing the issue and the Air Force Court of Military Review rejected the argument. We too reject the argument. Most significantly, however, the appellant's argument fails as to the particular regulation in question (OPNAVINST. 5510.1G) and its application to appellant's specific situation. His argument fails because of the overriding nexus of: (1) the specificity of the regulation in question as to what and to whom its prescriptions and prohibitions pertained; (2) the sensitive nature of the position he held at the time of the offenses and the identification of that position as sensitive by the regulation; (3) the duties and responsibilities he was required to meet as reproduction clerk dealing with classified documents at the Naval Telecommunications Command Center; (4) his personal, actual knowledge of the duties and responsibilities that the regulation required him to meet; (5) his actual knowledge that his failure to obey the regulations could subject him, a retiree, to court-martial jurisdiction; and (6) his background as a 22–year career Navy member attuned to the responsibilities and duties associated with the handling of classified material because his service duties as a senior chief radioman involved obeying the same regulation in question. *Compare* Article 2(a)(4), UCMJ (jurisdiction of courts-martial over retirees receiving pay) and *United States v. Attardi*, 20 U.S. C.M.A. 548, 43 C.M.R. 388 (1971) (evidence showing that servicemember charged with accountability for handling classified documents was circumstantial evidence sufficient to prove that he was chargeable with knowledge of general order setting forth procedures for handling such documents). Based on the facts and circumstances of appellant's case, this assignment of error is without merit.

## X. RETIREE NOT SUBJECT TO ORDERS

■ Appellant also asserts that the findings of guilty to Charge I and Specifications 2–8 should be dismissed because as a retired member of the regular Navy he is not subject to the orders of an active duty flag officer. This assertion appears to ignore the interrelationship of the provisions of Articles 92 and 2, respectively: "Any person subject to the Code who violates or fails to obey a lawful general order or regulation ..." and "[r]etired members of a regular component of the armed forces who are entitled to pay" are subject to the Code. Additionally, we take judicial notice of Article 0811.1, *United States Navy Regulations*, which states:

> All persons in the naval service on active service, and *those on the retired list with pay*, and transferred members of the Fleet Reserve and the Fleet Marine Corps Reserve, are at all times subject to naval authority.

(Emphasis added.)

As in *Pearson v. Bloss*, 28 M.J. 376 (C.M.A. 1989), the appellant was a member of the regular component of the United States Armed Forces who retired as a senior enlisted man after more than 20 years of active service and at the time of the offense was receiving retired pay. He too "clearly meets all the requirements for court-martial jurisdiction expressly provided in Article 2(a)(4)." *Id.* at 378. Furthermore, it has long been settled that jurisdiction over a retired member of the regular component of of the armed services entitled to pay attaches by virtue of Article 2(a)(4), UCMJ, and that no orders recalling the member to active duty are required to effect that jurisdiction. *United States v. Hooper*, 9 U.S.C.M.A. 637, 26 C.M.R. 417 (1958). In fact, secretarial regulations prohibit the recall to active duty of a retired member solely for the purpose of exercising court-martial jurisdiction. JAGMAN § 0116c(5). Accordingly, we find no merit whatsoever to appellant's argument that

before he could be held criminally liable for violation of the regulation in question and charged for violating Article 92, UCMJ, he had to have been in receipt of orders recalling him to active duty. The military judge did not err by failing to dismiss Charge I and the specifications thereunder.

## XI. TWELVE MEMBER COURT–MARTIAL

 Appellant contends that the failure to provide a twelve-member panel at his court-martial violates the Due Process Clause of the Fifth Amendment to the Constitution and requests this court recommend the adoption of the twelve-member panel in general court-martial cases. The present mandated minimum size for court-martial panels, he argues, is the product of two centuries of historical inertia, and that though the present requirements accord with Congressional mandate, there is no reason for the military justice system to defer to Congressional judgment in a matter so serious as this.

While the Sixth Amendment to the Constitution requires trial by jury in Federal criminal cases, and that jury's composition must be a representative cross-section of the community, courts-martial have never been considered subject to the jury-trial demands of the Constitution. *United States v. McClain*, 22 M.J. 124 (C.M.A. 1986) (and authorities cited therein); *see O'Callahan v. Parker*, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969). The authorities cited by appellant to buttress his claim of due process violation, *Ballew v. Georgia*, 435 U.S. 223, 98 S.Ct. 1029, 55 L.Ed.2d 234 (1978) and *Burch v. Louisiana*, 441 U.S. 130, 99 S.Ct. 1623, 60 L.Ed.2d 96 (1979), do not in any way limit the power of Congress to create rules for courts-martial pursuant to Article I, Section 8 of the Constitution, irrespective of the requirements of the Fifth and Sixth amendments and Article III, Section 2 of the Constitution. *See Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957).

Although a military trial must be fair and impartial, there are structural differences between courts-martial and federal civilian trials necessary to accommodate the separate nature and ends of military society. *See O'Callahan*, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291; *cf. United States v. Guilford*, 8 M.J. 598, 602 (ACMR 1979), *pet. denied*, 8 M.J. 242 (C.M.A.1980). The military tribunal which tries a military accused is distinct both in function and composition from the Federal criminal jury envisioned by the Sixth Amendment. The selection of members rests on specified qualifications, specialized knowledge, and ordinarily subject to only one peremptory challenge. The powers of a panel of military members includes the questioning of witnesses and the determining of sentences. These differences between a Federal civilian jury and the members composing a court-martial are recognized as necessary and constitutional, and appellant warrants no relief due to the number of members on his court-martial panel. *Id.*

Accordingly, we affirm the findings and sentence [34] approved on review below.

Judges WILLEVER, FREYER, STRICKLAND, JONES, HILTON AND RUBENS concur.

Chief Judge BYRNE and Senior Judge McLERAN did not participate in any aspect of this case.

---

**34.** The military judge properly found the offenses multiplicious for sentencing purposes. We do not discuss their multiplicity for findings.